ZOE ASBURY v. HICKLIN et al.; JOSEPHINE HICKLIN, Appellant.

Division One, May 25, 1904.

1. **OBJECTIONS: Reserving Decision: Exception.** The practice of hearing evidence subject to objection, reserving the ruling until the decision of the case, is erroneous, and is ground for reversal if the evidence is material and exception is saved.

2. ———: ———: **No Exception.** And even when exception is not taken in such case, if the evidence is incompetent and is of such a character as is justly calculated to influence the mind, the fact that it was received and retained while the cause was held under advisement, is a fact to be weighed by the appellate

court when it is balancing the conflicting evidence and considering to what extent deference should be given to the finding of the trial judge.

3. **CONTRACT FOR CHILD: By Mother: Competency When Other Party Dead.** The contract by which a mother gives her four-year-old daughter to another to raise, care for and provide for as her own child, is not made by the mother as agent for the child, but by the mother in her own right, in which she transfers her maternal rights in her child to another. And, if that other is dead, the mother is not a competent witness, either as a party to the contract or as the agent for the daughter, to state the terms of the contract, in a suit by the child to establish her right to share in that other's estate.

4. ———: **Statute of Frauds: Equitable Interference.** Courts of equity, in specifically enforcing an oral contract to make a will in a particular manner for the benefit of a child which the deceased had taken to raise, have not intended to annul the statute of frauds, but only to prevent it being made the means of perpetrating a fraud on the child.

5. ———: ———: **Existence of Contract: Necessary Proof.** But to justify a court of equity in going against the plain words of the statute of frauds, the oral proof of the contract must be so cogent, clear and forcible as to leave no rea-sonable doubt in the mind of the chancellor as to its terms and character.

6. ———: ———: ———: ———: **Case Stated.** The mother of the child testified that the woman to whom she transferred her maternal right in the child "told me that, if I would bring the child back and never interfere, she would take her as her own child and do a child's part by her;" and being further pressed, said: "I was to bring her back and she was to keep her and was to educate her and treat her as her child and she should heir as a child in everything." *Held,* that this last clause is simply the witness's conclusion as to the effect of the contract, *and,* that being the case, even if a married woman could have made a contract in 1878 that this child should heir her property as her own child, which she could not, there is no evidence that she made such a contract. Besides, the testimony did not come from the lips of a competent witness.

7. ———: ———: ———: ———: ———: **Subsequent Declaration.** Statements by the foster mother of the child, in the last few years of her life, from time to time, that she intended the child to have her property when she died, are more naturally indicative of a gratuitous testamentary intention than they are of an acknowledgment of an existent contract to do that.

Appeal from Johnson Circuit Court.—*Hon. Wm. L. Jarrott,* Judge.

REVERSED AND REMANDED (*with directions*).

*O. L. Houts* for appellant.

(1)   Even if Mrs. Baldwin, who was covert, was capable of making the contracts alleged in the petition, which is denied, before plaintiff can recover she must show by proof so clear and forcible as to leave no reasonable doubt in the mind of the chancellor that Mrs. Baldwin, by a contract clear and definite in terms, agreed to give at her death her property to plaintiff, in consideration of personal services to be rendered by her to Mrs. Baldwin, and that such services had been faithfully performed by plaintiff, and that the acts performed referred to and resulted from that contract, and are such as would not have been done unless on account of that very agreement and with a direct view to its performance.   Kinney v. Murray, 170 Mo. 674; McElvain v. McElvain, 171 Mo. 244; Steele v. Steele, 161 Mo. 566; Teats v. Flanders, 118 Mo. 660; Sutton v. Shipp, 65 Mo. 297; Goodwin v. Goodwin, 172 Mo. 48; Shehan v. Sivan, 48 Ohio St. 39; Nickerson v. Nickerson, 127 U. S. 76; McTague v. Finnegan, 54 N. J. Eq. 457.   The same cogency of testimony is necessary to establish a contract of this character as is necessary to establish a resulting trust.   Berry v. Hartzell, 91 Mo. 134; Pitts v. Weakley, 155 Mo. 109.   The contract could not be proved by evidence of declarations made by Mrs. Baldwin, who was deceased at the time of the trial.   To establish the contract, such declarations must have been "strongly corroborated" by evidence of so cogent a character as to leave no room for reasonable doubt in the mind of the chancellor who heard the case.   Courts place little reliance in testimony of declarations of deceased persons when used to affect legal title to property; not because of the want of credibility of witnesses, but in consequence of the extreme uncertainty of human recollection and the inability of witnesses to detail all that was said or the language spoken.   Berry v. Hart-

zell, 91 Mo. 132; Fanning v. Doan, 139 Mo. 392; Pitts v. Weakley, 155 Mo. 109. This is a suit for specific performance of a contract. Parties are not entitled to specific performance of a contract as a matter of right. It requires much less strength of case to resist a bill for specific performance than it does to maintain one. Specific performance never will be enforced when performance would be inequitable. Veth v. Gierth, 92 Mo. 97. (2) Mrs. Tyler could not testify in this case and the trial court properly excluded her evidence. R. S. 1899, sec. 4652; Banking House v. Rood, 132 Mo. 261; Bank v. Slattery's Admr., 166 Mo. 620; Wright v. Tinsley, 30 Mo. 389.

*W. W. Wood* and *J. W. Suddath* for respondent.

(1) A verbal contract made for the sale or disposition of land is not void under the statute if the contract is partially performed. Sutton v. Hayden, 62 Mo. 101; Koch v. Hebbel, 32 Mo. App. 103; Fuchs v. Fuchs, 48 Mo. App. 18; West v. Bundy, 78 Mo. 407; Clark v. Cordy, 69 Mo. App. 6; Sharkey v. McDermott, 91 Mo. 647; Teets v. Flanders, 118 Mo. 660; Nowack v. Burger, 133 Mo. 24; Halferty v. Scearce, 135 Mo. 433. (2) A contract of a married woman for the sale and disposition of real estate and personal property belonging to her as legal estate, is not void but good. Bank v. Hageluken, 165 Mo. 443; Brown v. Dressler, 125 Mo. 589; Blair v. Railroad, 89 Mo. 391; Broughton v. Brand, 94 Mo. 174; Halferty v. Scearce, 135 Mo. 433; Neimer v. Neimer, 70 Mo. App. 609; Long v. Martin, 71 Mo. App. 569. (3) A court of equity will specifically enforce a parol promise to adopt another as child and heir or to leave to another the whole or a definite portion of one's estate as a reward for peculiar personal services received, or other acts to be done by the promiser, which are not susceptible of a money valuation, and were not intended to be paid for in money, where there has been such partial or full performance that

the refusal to complete would work a fraud upon the opposite party. Gupton v. Gupton, 47 Mo. 37; Sharkey v. McDermott, 91 Mo. 647; Nowack v. Berger, 133 Mo. 24; Lynn v. Hockaday, 162 Mo. 111; Godine v. Kidd, 19 N. Y. Supp. 33; Brinton v. Van Cott, 8 Utah 480, 33 Pac. 218; Burns v. Smith, 21 Mont. 251, 69 Am. St. 653; Johnson v. Hubbel, 10 N. J. Eq. 332, 66 Am. Dec. 773; Owens v. McNally, 113 Cal. 445, 45 Pac. 710; Van Dyne v. Vreeland, 11 N. J. Eq. 371; Wright v. Wright, 23 L. R. A. 196, 99 Mich. 170; Kofka v. Rosicky, 41 Neb. 328, 25 L. R. A. 207; Vantine v. Vantine, 15 Atl. 249. (4) At any time after the passage of the Act of March 25, 1875, Mrs. Baldwin had the right to dispose of her personal property, even if acquired before the passage of that act, subject to the marital rights of her husband. If plaintiff has established the agreement alleged in the complaint, defendant can under no circumstances have any interest in the personal property, and it is immaterial whether it was acquired before or after the passage of the Married Woman's Act. The petition only seeks to have the contract performed as to the personal property of which Mrs. Baldwin died seized, and in the hands of John Baldwin as administrator. As to this, it must be presumed that it was her separate or statutory property or John Baldwin would not have taken possession of it as such. Indeed, he would be stopped by doing so, from claiming otherwise. In his answer he expressly admits plaintiff's right to the personal property and he alone has the right to dispute plaintiff's right upon the ground urged in appellant's fifth point. R. S. 1899, sec. 6864 and 6869; Bank v. Hageluken, 165 Mo. 443. (5) Under the Revised Statutes of 1889 and since that date a married woman may contract to convey any of her property, real or personal, without reference to when she received it. "Her power is the same as a *feme sole* and not limited to any particular class of contracts or confined to any species of property." Brown v. Dressler, 125 Mo.

594; Bank v. Hageluken, 165 Mo. 443. (6) A party may contract to make a will. Koch v. Hebbel, 32 Mo. App. 103; Sutton v. Hayden, 62 Mo. 101; Sharkey v. McDermott, 91 Mo. 647. (7) Under all the authorities she could contract to convey and if she could not convey by deed but could by some other means, then the court would compel her to convey in the manner that she possessed the ability to convey, and she could do this by will. R. S. 1889, sec. 8869; Sutton v. Hayden, 62 Mo. 101. (8) (a) Mrs. Tyler was a competent witness. The statute only disqualifies a witness from testifying in his own favor where the other party is dead, and where a witness has no interest in the controversy he is not testifying in his own favor. Ford v. O'Donnell, 40 Mo. App. 63; Godine v. Kidd, 64 Hun 593. (b) An agent for one of the parties is clearly a competent witness where the other contracting party is dead, for he has no interest in the subject-matter of the litigation and is clearly not testifying in his own favor. Stanton v. Ryan, 41 Mo. 510; Clark v. Thias, 173 Mo. 643; Baer v. Pfoff, 44 Mo. App. 39; Leahy v. Simpson, 60 Mo. App. 83; Leeper v. McGuire, 57 Mo. 360; 29 Am. & Eng. Ency. Law, pp. 718, 719. (c) Mrs. Tyler, while not technically an agent, occupies the same relation to the plaintiff as if she were such. Godine v. Kidd, 64 Hun 593. (9) The proviso in the statute relates only to those who are parties to or interested in the suit. Loker v. Davis, 47 Mo. 140; Angel v. Hester, 84 Mo. 142; Meier v. Thieman, 90 Mo. 441; Baer v. Pfoff, 44 Mo. App. 39. (10) (a) The statute is an enabling one instead of disabling, and a witness is competent to testify to any fact he might have testified to at common law. Ring v. Jamison, 66 Mo. 429; Angell v. Hester, 64 Mo. 142; Meier v. Thieman, 90 Mo. 442; Kulin v. Ins. Co., 71 Mo. App. 308; Baer v. Pfoff, 44 Mo. App. 39; Leahy v. Simpson, 60 Mo. App. 84; Samuel v. Bartel, 53 Mo. App. 588. (b) Agents were competent witnesses at common law. 1

Greenleaf on Evidence (14 Ed.), secs. 411-416. (11)
(a) In Nowack v. Berger, 133 Mo. 37, Mrs. Nowack
(or Schumer) was both a party to the contract and to
the cause of action and was therefore testifying in her
own favor. (b) In Banking House v. Rood, 132 Mo.
256, the agent under discussion was an agent of the cor-
poration and therefore in the eyes of the law the cor-
poration itself; and the court overlooked the provision
of the statute that he is only incompetent to testify "in
his own favor." Williams v. Edwards, 94 Mo. 452.

VALLIANT, J.—The plaintiff brings this suit
against the heirs of Samantha E. Baldwin, deceased,
and the administrator of her estate, to enforce the
specific performance of an alleged contract, to the effect
that the plaintiff, who was then an infant four years
old, was to be taken into the family of the intestate,
reared as a daughter and receive, at the death of the
intestate, one-half her estate. The petition states that
in 1878 Mrs. Baldwin, who was then the wife of defend-
ant John L. Baldwin, had one son, David, about four-
teen years old; the alleged contract is stated in the peti-
tion in these words: "That at that time the said
Samantha E. Baldwin took the plaintiff, then a child
about four years of age, from her mother and orally
agreed with the mother of this plaintiff, that if this
plaintiff would live with her, the said Samantha E.
Baldwin, and do the part of a child and act and live with
her as a member of the family and render to her, the
said Samantha E. Baldwin, all the attentions, services
and care that a dutiful daughter would render in the
family, that she, the said Samantha E. Baldwin, in con-
sideration thereof, would, at her death, give to this plain-
tiff one-half of all the property of which she might die
seized, and to her son, David Baldwin, the other half."
The petition then states that the plaintiff went into the
family on those terms and faithfully bestowed the care,
attention and affection and rendered the services of a

daughter to Mrs. Baldwin up to the year 1897, when the son David died, leaving his mother and father his only heirs; that prior to the death of her son, who in his lifetime had acquired considerable property of his own, Mrs. Baldwin orally promised the plaintiff that if she would continue to live with her as her daughter and take care of her and render services like a dutiful child she would at her death give her all the property of which she might die seized, and repeated that promise orally many times both before and after the death of her son David. That the plaintiff, in consideration of the agreement, continued to bestow such care and render such service to Mrs. Baldwin up to the time of her death in 1899. That Mrs. Baldwin died intestate leaving personal estate of the value of $1,200 and considerable real estate, the larger part of which was a farm she had inherited from her father, and which she owned in 1878 when she made the contract with plaintiff's mother; the rest she inherited from her son who died in 1897. She left her husband surviving, who is now the administrator of her estate, and a sister, Mrs. Hicklin, who claims to be her heir at law. The prayer of the petition is for the specific enforcement of the contract, by a decree vesting all the property in the plaintiff.

The husband, as administrator, filed an answer denying all the allegations of the petition; then in his own right, as surviving husband, he filed another answer admitting all the allegations of the petition to be true. Mrs. Hicklin filed an answer which amounts to a general denial.

On the trial the plaintiff offered evidence which tended to prove as follows: She was born in the household of Mr. and Mrs. Baldwin while her mother was living there. She continued to live in the family until she was about four years old, when her mother got married and moved away taking her with her. About two months after moving away, her mother brought her back, and she was received again in the Baldwin family,

was reared as a member of the family, was known by the name of Zoe Baldwin, was always kind and affectionate to Mrs. Baldwin as a good daughter would be, and Mrs. Baldwin was in turn kind and affectionate to her as a good mother would be. As the plaintiff grew large enough to perform household work she did so, was the mainspring of the household so far as its work was concerned, and was loved and respected by all the family. The family consisted of Mr. and Mrs. Baldwin, their son David, Zoe, and a youth named James Spencer. James was an orphan of no kin to the Baldwins, but had been taken into the family when he was ten years old, treated as a member thereof with kindness and affection and had rendered the services that were to be expected of one in his situation; he was still living in the family at the date of the trial, and was then twenty-nine years old. The plaintiff was married in 1896, but continued to live in the Baldwin family, and render the services and bestow the care and attention on Mrs. Baldwin until her death in 1899.

The only witness offered by the plaintiff to prove the alleged contract was the mother of the plaintiff with whom it is alleged Mrs. Baldwin made the contract. When this witness was offered the defendant, Mrs. Hicklin, objected, on the ground that it was the offer of the testimony of one of the parties to the contract in issue and on trial when the other party was dead. The court ruled that it would hear the testimony and pass on its admissibility afterwards.

The counsel for defendant said: "I would like to have the matter passed on now." Counsel for plaintiff said: "We admit that the plaintiff is disqualified; but this is the agent who made the contract." The court said: "I will hear her testimony subject to your objection."

This witness's testimony as to the contract was that about two months after she had taken the child away, "Mrs. Baldwin had me bring her back. Q. Tell the

conversation between you and Mrs. Baldwin? A. She told me if I would bring the child back and never interfere she would take her as her own child and do a child's part by her. Q. Well what further did she say, if anything? A. That is the biggest part of it; I was to bring her back and she was to keep her and she was to educate her and treat her as her child and she should heir as a child in everything.''

The rest of the plaintiff's testimony was the relation by witnesses of the purport of conversations had with Mrs. Baldwin running through the period of the last ten years of her life, the substance of which was that she intended for Zoe to have her property at her death. The following is an epitome of this evidence:

George Edwards (colored): ''She said Zoe was to have an equal share in the family.'' Mrs. Scruggs: ''She called it her Honey Creek farm and she said when she was done with it it was for Zoe.'' Mrs. Taylor: ''She wanted Zoe to stay with her while she lived and take care of her and she would give her what she had at her death.'' Frank Day, a young man paying attention to Miss Zoe: Mrs. Baldwin ''told me how good Zoe was to work; said she never had to tell her the second time, and then she said she expected when she died to give Zoe everything she had; she said Zoe was next to Dave with her and she never expected him to live long as he was afflicted sometime and she expected when he died Zoe was to have everything.'' James Spencer was present and heard the conversation that Mrs. Taylor testified about, and had a conversation with Mrs. Baldwin about the time Zoe was married in which she said that when Mr. Asbury asked Mrs. Baldwin for Zoe; ''she told him she always intended to give Zoe what she had if she stayed with her,'' and Mr. Asbury promised he would never take her away. This witness had been reared in the family as a member, went to school, worked on the farm, was paid no wages, but understood he was to have one of the farms; Dave, in his lifetime,

had said so, and after his death Mrs. Baldwin had said that witness was to have Dave's farm. W. W. Howard visited Mrs. Baldwin's son during his illness: "Mrs. Baldwin told me when she got through with what she had, she expected to give what she had to Zoe." Bart Jackson in 1896 after Zoe's marriage heard Mrs. Baldwin say that "she intended for her (Zoe) to stay with her as long as she lived, and she would give her her part, all what she had." Andrew Lockard in 1896-7 heard Mrs. Baldwin say: "That farm belongs to me, and I have got two children and she says of course that farm is intended for them; my farm that you live on, and she says, which ever one goes, it will fall to the other; that's just the remark she made." This witness had a talk with her in 1899 at her sister's where she died: "She seemed troubled about Zoe having such hard work at home, but she says there is one thing, I may never live to get there, but if I do or if I don't, what little I have got she has worked hard for, and I calculate for her to have it." T. J. Whitsett in 1897-8 asked Mrs. Baldwin how many children she had; she said, "I have just two, Dave and Zoe; that Zoe was to have her property; she always spoke of Zoe as her own child and at times claimed her as her own child." Charles Shanks talked with Mrs. Baldwin in 1897-8, after the marriage of Zoe, referring to that: "I says, 'Now then you lose your housewife, do you?' She says, 'Charley, I can not spare her; she's the only girl I have got and I can not spare her away; she had to promise and so long as I live I will do a good part by her;' she would have a good reward." M. W. Mitchell talked with Mrs. Baldwin in 1897-8: "Well, she says, 'I want Jimmie and Zoe to have my property;' she told me that two or three different times; the first time I didn't really understand whether she wanted Jimmie Spencer or Jimmie Asbury, but the second time she told me which Jimmie it was, it was Jimmie Asbury." James Webster talked with Mrs. Baldwin in 1899; she re-

ferred to the death of her son, and "said Zoe was all she had left; in that conversation she said she intended her to have all her property; all she had, I believe was the way she put it." Mary F. Day saw Mrs. Baldwin in 1899: "She said she had been sick; was afraid she would die, said she was going to give Zoe her Honey Creek farm at her death; I have heard her say this lots of times."

At the close of the plaintiff's evidence, the defendant, Mrs. Hicklin, asked the court to declare as a matter of law that under the evidence the plaintiff was not entitled to recover, which the court refused and defendant excepted.

Testimony was then introduced on the part of defendant, Mrs. Hicklin, which tended to show that Mrs. Baldwin, in the beginning, was averse to receiving the child in her family, but yielded to the wishes of her husband in that respect; also that after the death of her son, David, she frequently said that what she left would go to her sister, Mrs. Hicklin; that the Honey Creek farm had come from their father, and she doubted if it was right for her to keep it, even in her lifetime, as her sister needed it more than she did, but at all events at her death Mrs. Hicklin would have it.

The foregoing was objected to by the plaintiff as incompetent, being self-serving declarations; the court ruled that it would hear the evidence subject to the objections. Defendants also introduced testimony tending to impeach the testimony of Lockard, by showing that he had said on various occasions that Mrs. Baldwin told him her sister was to have her property at her death.

The cause was tried and submitted at the June term, 1900, and taken under advisement until the February term, 1901, when the court ruled on the objections made to the testimony during the trial, sustaining that of Mrs. Hicklin to the testimony of the plaintiff's mother, and sustaining also that of the plaintiff to what

was judged to be the self-serving declarations of Mrs. Baldwin, to the effect that she intended her sister to inherit her property, and after so ruling the court entered a decree finding the issues in favor of the plaintiff, and giving to the plaintiff all the property, real and personal, which Mrs. Baldwin died owning. From that judgment Mrs. Hicklin prosecutes this appeal.

I.   The practice of hearing evidence subject to objection, reserving the ruling until the decision of the case, is erroneous, and is ground for reversal if the evidence is material and exception is preserved. And even when exception is not taken, if the evidence is incompetent and is of such a character as is justly calculated to influence the mind, the fact that it was received and retained while the cause was held under advisement, is a fact to be weighed by the appellate court when it is balancing the conflicting evidence and considering to what extent deference should be given to the finding of the trial judge. The chancellor himself does not know what influence the evidence may have had on his mind, and even though he concludes in the end to reject it as incompetent yet it is liable to leave its impression.

Besides, the party who has made the objection is left in a dilemma, not knowing whether to meet the testimony with testimony of like character to the contrary, or to trust to the final ruling on his objection in his favor.

It is a very rare exception when the question on the admissibility of evidence is so doubtful that it can not be decided by the chancellor to his own satisfaction after, at most, a few hours research, and if it is necessary to make that research he should stop the trial long enough to do it; the delay of the trial in such case, even if economy of time were the main consideration, will often prove in the end a saving of time and expense. But economy of time is of less importance than

the observing of the regular procedure in the trial of the cause.

II. The learned chancellor in this instance decided correctly that the plaintiff's mother was not a competent witness for the plaintiff to prove the alleged contract. When this witness was offered on the part of the plaintiff her counsel said: "We admit that the plaintiff is disqualified; but this is the agent who made the contract." And it is on that theory that respondent in her brief now contends that the witness was competent.

Our statute (R. S. 1899, sec. 4652), removes the disqualification on account of interest that the common law imposed, but adds the *proviso* "that in actions where one of the original parties to the contract or cause of action in issue and on trial is dead, or is shown to the court to be insane, the other party to such contract or cause of action shall not be admitted to testify, either in his own favor or in favor of any party to the action claiming under him," etc. The question of the proper construction of that *proviso* has come before this court in many cases of varying facts, calling for application of the statute in as many different phases. In Banking House v. Rood, 132 Mo. 256, l. c. 261, it was said: "This court has ever undertaken to conform its decisions to the spirit rather than to the strict letter of this statute. [Orr v. Rode, 101 Mo. 398.] . . . The exception was intended to prevent the injustice that would arise in permitting one party to the contract or cause of action to testify when the lips of the other are sealed in death. This equitable construction has been applied in a variety of cases. [Stanton v. Ryan, 41 Mo. 510; Williams v. Edwards, 94 Mo. 447; Orr v. Rode, supra; Leach v. McFadden, 110 Mo. 588; Bank v. Payne, 111 Mo. 298; Miller v. Wilson, 126 Mo. 54.]" And in further discussion of the principle and in illustration of it, it was pointed out in that case, that

in Miller v. Wilson, therein cited, it was held that though one party to the contract be dead, yet if the contract on the part of the deceased was negotiated by an agent who is living, the other party to the contract is a competent witness, and, as in Williams v. Edwards, supra, if both parties be living, yet if one had made the contract through an agent who is dead, the other party could not testify. Keeping in view the just and equitable principle on which these decisions have been founded, how can we say that though one party to a contract is dead, yet if his agent who made the contract for him is living the other party is a competent witness, and though both parties are living if the agent who made the contract for one is dead, the other can not testify, and yet say that when one party is dead the agent for the other may testify? We have not in the cases above referred to adhered so closely to the letter as to neglect the spirit of the statute. But this case does not call for a decision of the question as to the competency of this witness viewing her in the light of an agent, because she was in no sense an agent. She was the sole parent of this child, and if she made the contract it was in the capacity of a mother transferring her maternal rights in her child to another. She alone in her own right could have made the alleged contract, she was essentially a party to it, and the fact that it was made (if made) for the benefit of the child does not alter the case. [Nowack v. Berger, 133 Mo. 24.]

Respondent refers to Godine v. Kidd, 64 Hun 585, to support her contention on this point. The court held in that case that the mother of the child, under circumstances similar to those in this case, was competent to prove the oral contract to adopt her. But the court was dealing with a case under the statute of that State which is quite different from ours. The only provision of the New York statute which it was claimed disqualified the witness was a section to the effect that a person under or through whom a party derives his title could not be

a witness for that party, against one deriving his title from a deceased person, concerning a personal transaction between the witness and the deceased person. The court held in that case, that the child did not derive title through her mother, albeit the contract was made for the benefit of the child.

·In the case at bar the plaintiff's mother, being a party to the alleged contract in issue and on trial, the other party being dead, was not a competent witness.

III.   The equitable principle which the plaintiff lays down as the foundation of her case is not denied; it has often been before this court for judgment and has always been sustained.   In one of the more recent cases this court, per BRACE, P. J., stated the law in these words:

"A court of equity in this State will specifically enforce an oral contract to make a will in a particular manner, where a valuable consideration has been received for the promise, and a fraud would be perpetrated upon the promisee or beneficiary unless the contract be performed.   But the proof of such a contract must be so cogent, clear, and forcible as to leave no reasonable doubt in the mind of the chancellor as to its terms and character; and where a consideration consists of acts to be performed, there must be like proof that the acts performed refer to and result from that contract, and are such as would not have been done unless on account of that very agreement and with a direct view to its performance. 'There must be no equivocation or uncertainty in the case.'   This doctrine is established, and its application illustrated, in a long line of cases. [Charpiot v. Sigerson, 25 Mo. 63; Wright v. Tinsley, 30 Mo. 389; Gupton v. Gupton, 47 Mo. 37; Sutton v. Hayden, 62 Mo. 101; Sitton v. Shipp, 65 Mo. 297; Sharkey v. McDermott, 91 Mo. 647; Davis v. Hendricks, 99 Mo. 478; Rogers v. Wolfe, 104 Mo. 1;

Teats v. Flanders, 118 Mo. 660; Nowack v. Berger, 133 Mo. 24; Alexander v. Alexander, 150 Mo. 579; Steele v. Steele, 161 Mo. 566; Lynn v. Hockaday, 162 Mo. 111; McElvain v. McElvain, 171 Mo. 244.]   To which others might be added.

"When, as in this case, and in consonance with this doctrine, a court of equity is called upon to establish and enforce a contract of this character, in the teeth of the statute of wills, and of the statute of frauds and perjuries, and to set aside a disposition of valuable property made in conformity with the requirements of those statutes, there is devolved upon the chancellor the greatest responsibility, perhaps, that ever attaches to his high office.   And nothing short of the inherent justice of the claim, supported by evidence that can be relied upon with the utmost confidence, proving the existence of the contract, its terms and conditions and a substantial and meritorious compliance therewith, with such certainty and definiteness as to leave no room for reasonable doubt, can ever justify the exercise of such an extraordinary prerogative." [Kinney v. Murray, 170 Mo. l. c. 700.]

By reference to the cases cited in that opinion it will be seen that this court, whilst holding to the principle on which the plaintiff founds her case, has also held closely to the rule above stated regarding the character of the proof required, and has always refused the relief sought when the proof has not been of that kind.

We are asked in the case at bar to enforce an oral contract alleged to have been made with no witness present, by a married woman, who at the time had an only son and a husband living with her, a contract highly injurious to the expectations then of her own child, yet one into which she is alleged to have entered without apparent consultation with or regard for him, and she being now dead having left no line by will or deed recognizing such an obligation.   It is because the estate of a deceased person is thus left, as it were, at

the mercy of the claimant, in the matter of proof of such a contract that the courts should be firm in holding one to the strict rule. The law under the statute of frauds would exclude all evidence of such a contract not in writing. That statute was enacted to prevent fraud and to remove the temptation to commit perjury, recognizing that it were better to leave such contracts, which the parties had not seen fit to evidence by writing, unenforced, than risk the consequence of spurious claims being established by false testimony. Courts of equity, in establishing the doctrine invoked by the plaintiff, have not by any means intended to annul the statute of frauds, but only to prevent it being made the means of perpetrating a fraud. Therefore, when the contract with its terms and conditions is established by proof which is beyond question and performance by one party to it has also been shown, a court of equity will not allow the other party to perpetrate a fraud by shielding himself under the statute that was designed to prevent frauds. But to justify a court of equity in thus going against the plain words of the statute, the oral proof of the contract must be "so cogent, clear and forcible as to leave no reasonable doubt in the mind of the chancellor as to its terms and character." Has the plaintiff in this case met that requirement? The allegation of the petition is that Mrs. Baldwin agreed that she "in consideration thereof would, at her death, give to this plaintiff one-half of all the property of which she might die seized, and to her son David Baldwin the other half." The only witness who spoke of a contract at all was the plaintiff's mother, and this is what she said: "Q. Tell the conversation between you and Mrs. Baldwin? A. She told me if I would bring the child back and never interfere she would take her as her own child and do a child's part by her." That is all there is of this witness's testimony in which she undertakes to state what Mrs. Baldwin said; when pressed by plaintiff's counsel for further testimony:

"Q. Well, what further did she say, if anything? Do you remember any of the balance of the conversation? A. That is the biggest part of it; I was to bring her back and she was to keep her and she was to educate her and treat her as her child and she should heir as a child in everything." That addition was simply the witness's conclusion as to the effect of the contract; she did not undertake to say that Mrs. Baldwin said anything more than that she would take the child as her own and do a child's part by her. What Mrs. Baldwin meant by that Mrs. Baldwin did not explain, but the witness attempted to give her explanation of it. Suppose Mrs. Baldwin did say that she would take the plaintiff as her own child "and do a child's part by her," what did she mean? She was then a married woman, and at that time, 1878, she was incapable in law of making a contract of the kind stated in the petition, but she was not incapable of receiving the child into her family and bestowing on it maternal care, and that is all in law she could do, and the words imputed to her are liable to that meaning. Learned counsel say that although in 1878 a married woman was under some disabilities as to making contracts, yet after 1889 she could have ratified what she had agreed to in 1878. But in our judgment there is no evidence that she attempted to make a contract in 1878, and no evidence that she attempted to ratify one after her disabilities were removed in 1889.

Even if the testimony given by the plaintiff's mother had come from the lips of a competent witness, it would not have proven the contract alleged in the petition, but since it was the testimony of an incompetent witness it should be banished from our minds.

Leaving that testimony out, there is not any testimony at all tending to prove the alleged contract. The tenor of the testimony of all the plaintiff's witnesses on this point was that Mrs. Baldwin in the last few years of her life, from time to time, had said that she intended

Zoe to have her property when she died.  Statements of that kind are more naturally indicative of a gratuitous testamentary intention than they are of the acknowledgment a contractual obligation.  Those witnesses all showed a willingness to say anything that they could truthfully say to sustain the plaintiff's case, yet not one of them said that Mrs. Baldwin made any reference to a contract she had made with Zoe's mother or with Zoe herself or with any one for her, and it does not appear that Zoe was present at any of the conversations to which the witnesses referred.

If Mrs. Baldwin was conscious of having made such a contract, and if she was as anxious for the plaintiff to have her property when she died as they said she was, she would naturally have executed a deed or will to carry out the contract, but she did nothing of the kind.

Mr. Baldwin was not a witness in the case.  He doubtless knew more about it than any one else; it is natural that he should know.  It was stated by the plaintiff's counsel during the trial that Mr. Baldwin was sick and had gone out of the State a few days before for his health.  His disposition towards the plaintiff in the suit was shown by his individual answer to the petition in which he admitted the truth of all its allegations.  It appears also from evidence in the case that Mr. Baldwin's attitude towards the plaintiff is such that the services she rendered in the family and the affection she bestowed might as naturally have been rendered and bestowed with the expectation that they would be requited and reciprocated by him as by his wife.

In our judgment the plaintiff failed to prove her case.

The judgment is reversed and the cause remanded to the circuit court with directions to enter a decree for the defendants, dismissing the plaintiff's bill.

All concur, *Marshall, J.*, not sitting.