THERESA V. NIEHAUS, Plaintiff-Appellant, v. THOMAS R. MADDEN, Administrator of the·Estate of HENRIETTA A. S. BORCK, and EDWARD STOFFREGEN, Defendants-Respondents, and CHARLES FREDERICK STEIDE, and the unknown consort, heirs, devisees, donees, alienees or immediate, mesne or remote, voluntary or involuntary, grantees of said HENRIETTA A. STOFFREGEN-BORCK, also known as DR. HENRIETTA A. S. BORCK, Cross-Defendants.— 155 S. W. (2d) 141.

Division One, October 30, 1941.

*Charles A. Lich* and *James T. Blair, Jr.*, for appellant.

772

*Igoe, Carroll, Keefe & McAfee* and *Detjen & Detjen* for respondents.

HAYS, J.—This suit was instituted by the present appellant in the Circuit Court of the City of St. Louis. It was tried in one of the equity divisions of that court and from a decree in favor of the defendants plaintiff appealed.

The bill alleges that one Henrietta A. S. Borck died in July, 1937, domiciled in the City of St. Louis; that Henrietta A. S. Borck left a last will which was duly probated under which she devised and bequeathed the bulk of her estate to the defendant Edward Stoffregen, a resident of Germany and subject of the Reich; that the defendant Madden had been duly appointed and qualified as administrator c.t.a. of the Borck estate. The bill further alleges that many years prior to the death of Henrietta A. S. Borck she had entered into a contract to adopt the plaintiff as her daughter; that this contract had been fully performed on the part of the plaintiff but that no formal adop-

tion had been made; that plaintiff is not mentioned in the last will of Henrietta A. S. Borck and was therefore a pretermitted heir. The bill therefore prays the specific performance of the contract of adoption and a declaration that the plaintiff is entitled to the estate as pretermitted heir. Both defendants answered, denying the allegations of the bill with reference to the alleged adoption. The defendant Madden in his answer, after pleading laches and the statute of frauds sets up Article 7 of the Borck Will, which was as follows:

"7. Desiring that this our last will and testament be not contested or set aside we bequeth [sic] the sum of one dollar ($1.00) into [sic] all other heirs or kindred of whatever degree of relationship jointly and collectively to be paid to and be shared by them as their full and final interest of our estate."

This is set up as a sufficient mentioning of the plaintiff to prevent her from being a pretermitted heir. The answer also prays that certain other parties, to-wit: Charles Frederick Steide, brother of the plaintiff, and the unknown heirs, etc., of Henrietta A. S. Borck be brought in as third party defendants and their rights in the estate declared and determined. Due service was had upon these third party defendants but they all made default.

The facts developed in the evidence are as follows: The decedent was the second wife of Dr. Edward Borck and was the niece of his first wife. Like her husband she was a doctor of medicine. Dr. Edward Borck had been born in Germany but had come to this country shortly before the war between the states, in which he had served as a surgeon with the northern army. At the end of the war he settled in St. Louis and some years later he and his first wife brought Henrietta from Germany to live with them. Dr. Edward educated her as a doctor. A few months after the death of his first wife he married her and they continued to live together until his death, both of them practicing their profession.

The plaintiff is a granddaughter of Dr. Edward's sister. Some time prior to 1908 she and her three brothers were orphaned by the death of their father, their mother having predeceased him. One Antone L. Meyer was appointed as guardian of the children by the Orphans' Court of the City of Baltimore, Maryland, where they resided. While Meyer insisted that he was merely the curator of the children's estate, the court record shows that he was their general guardian.

There is evidence that before the death of plaintiff's father, Dr. Edward and Dr. Henrietta desired to adopt plaintiff. The father, however, refused to consent. In 1908 the Borcks made a trip to Germany. On their way to take ship they stopped in Baltimore where a conversation occurred between Dr. Edward and the guardian Meyer. What was then said and done is of crucial importance in the case and the testimony must, therefore, be set out as it appears in the record. It runs thus:

"Q. Did you ever have occasion to meet Dr. Borck and his wife Henrietta Borck? A. I did.

"Q. When did you first meet Dr. Edward Borck? A. In the summer of 1908.

"Q. And where did you meet his wife, Dr. Henrietta Borck? A. At the same time, I think, that I met Dr. Borck, the summer of 1908.

"Q. And what was the occasion of your meeting with them at that time? A. They came to see me in Baltimore in reference to taking Theresa [the plaintiff] to their home. They came to see me in Baltimore in reference to taking Theresa to their home as their child as they had no children of their own *and Dr. Edward Borck said that he would like to adopt Theresa and take her into his home and treat her as his own child absolutely.* . . . After Dr. Edward Borck and his wife left me at that time they went to Europe. I never had any conversations at any later date with Dr. Edward Borck or his wife Henrietta, and never met them in person after the first time. However, I did have correspondence with Edward Borck thereafter. The correspondence started after Dr. Edward Borck came back from Europe. The letters were written from St. Louis, where he was living. I am sorry that I have not kept any of these letters."

The witness then testified that Dr. Edward Borck in the letters had asked him if he had made up his mind about Theresa coming to them. He, Meyer, then had a talk with Theresa who refused to go to St. Louis unless her younger brother Charles were taken along. Meyer communicated this fact to Edward Borck and was told to send both children, which he did.

On cross-examination Meyer further testified in regard to the transaction:

"Q. Did you see Dr. Edward Borck more than one time? A. No.

"Q. Was he alone when he came to Baltimore? A. No, he had his wife with him.

"Q. Are you sure about that? A. *I am sure about that, although I did not see her.*

"Q. You had no conversation or correspondence with his wife? A. Not any."

The witness testified that he did not obtain an order of the Orphans' Court to permit Theresa and Charles to go to St. Louis because he understood that he was merely their curator and not their general guardian.

When the children arrived in St. Louis they were immediately taken into the Borck home. Dr. Edward introduced them to certain of his friends as his "ready-made family." Charles was sent to school but Theresa was kept at home where she did all of the housework for the Borcks. Charles was at the time 14, Theresa 16. At first Henrietta seemed to be quite pleased with the arrangement, but after a short time the children began to irritate her. The Borcks were very strict

and the children were not permitted to associate with young people of their own age and were not introduced to many friends of the Borcks. While not of controlling importance it is interesting to note that Theresa never addressed the Borcks as "father" and "mother," but during all of the time up to their deaths continued to call them "uncle" and "aunt." Nor did Henrietta Borck ever address Theresa as "daughter," although she spoke to her occasionally as "my child." On several occasions she was introduced by Henrietta Borck as "Dr. Borck's niece."

Some eight months after the children came into the Borck home, Charles left to live with an uncle at Little Rock, Arkansas. A month later Theresa also left. Whether she did this with the consent of the Borcks or not is by no means plain. Her intention seems to have been to visit her uncle in Arkansas for a few weeks. Soon after she came to Little Rock, however, she met John Niehaus. They became engaged to marry and Theresa stayed on with her uncle. A year later she and Niehaus were married. The Borcks did not attend the wedding. They were apparently not consulted about it. Niehaus sought and obtained the approval of Charles Weinmann, Theresa's uncle; but, while Theresa was a minor, no formal legal consent to the marriage was gotten as she stated in her application for a license that she was over 21.

The Borcks did not seem to be displeased with the marriage and in fact shortly thereafter the Niehauses visited the Borcks in St. Louis and were treated in a kindly manner. Theresa continued to come to St. Louis at intervals to visit with the Borcks. At times she was accompanied by her husband and son. Although she did not come back to the city on the occasion of Dr. Edward's death and burial, this was because the telegram informing her of his death was not delivered and she did not receive the news in time. A number of years later when Henrietta Borck died, Theresa came back to St. Louis for the funeral. At this time, however, she did not introduce herself as Henrietta's adopted daughter but described herself as "Henrietta's niece."

There is evidence in the record that prior to 1908 Henrietta had made the statement to Theresa's Uncle Charles and others that she was anxious to adopt Theresa. In fact the uncle was asked to use his good offices to secure the consent of the parents. In this connection Henrietta said that she did not write personal letters and that Dr. Edward would correspond about the matter for her. There is also evidence that after the children came to St. Louis she said that she was glad she was going to get to adopt Theresa. Charles Steide, plaintiff's brother, testified that she told him that she wanted to adopt Theresa and that she had taken him into the home simply because she had to do so in order to get his sister. This conversation occurred

almost thirty years before Charles Steide's testimony was given at a time when he was only 14.

Adoption is a juridical act which creates between two persons a relation of purely civil nature similar to that existing between a natural parent and his child. In other words, it is an act by which one person who is not the natural parent of another creates between himself and that other a complex or aggregate of legal relationships, rights, privileges, powers, immunities, etc., which are identical with those which the law creates between a natural parent and his child. While adoption was an important institution of the Roman law it was unknown to common law. [1 Am. Jur., p. 622.] It exists, therefore, in this country solely as a creature of statute and the juridical act of adoption to be effective must therefore be the precise act required by the statute. Prior to 1917 the law of this State permitted adoption by means of a deed executed, acknowledged and recorded in the same manner as a deed to real estate by the adopter. [R. S. Mo. 1909, sec. 1671.] Since 1917 adoption must be effected by a decree of the proper juvenile court. [Laws of 1917, pp. 193-195.]

It has long been recognized, however, that a person who is legally competent to adopt may enter into a binding contract whereby for a good consideration he agrees to take another as his child. Where such contract is actually made and is based upon a good consideration and where it is fully performed by the person to be adopted but is not performed by the promisor during his lifetime, a court of equity will declare specific performance against the adopter's estate to the extent at least of making the adoptee an heir. [Remmers v. Remmers (Mo.), 239 S. W. 509; Dillmann v. Davison (Mo.), 239 S. W. 505; Kidd v. St. Louis Trust Co., 335 Mo. 1029, 74 S. W. (2d) 827; Benjamin v. Cronan, 338 Mo. 1177, 93 S. W. (2d) 975.] Furthermore, specific performance may be ordered even though the contract to adopt were an oral one. [Benjamin v. Cronan, supra.] We need not consider whether the contract actually falls within the language of the statute of frauds or not, for even an oral contract whose proof is ordinarily prohibited by that statute may be enforced in equity if it has been substantially performed by the promisee.

However, before a decree for specific performance may be rendered in such a case plaintiff must prove the existence of a contract to adopt. As in any other case, plaintiff may make such proof by direct evidence of persons who heard the contractual words spoken or saw them written. But plaintiff may also prove the existence of the contract by circumstantial evidence, in which event the circumstances must create a strong and certain inference that the contract was made. They must be consistent with the fact to be proved and inconsistent with any other reasonable hypothesis. It has been repeatedly said by this court that the evidence to prove a contract to adopt, whether it be direct or circumstantial, must be clear, unequivocal and of a

strong and compelling nature. Some decisions have even intimated that the proof must be beyond a reasonable doubt. Certainly it must leave nothing to conjecture or guess. [Taylor v. Hamrick (Mo.), 134 S. W. (2d) 52; Grantham v. Gossett, 182 Mo. 651, 81 S. W. 895; Lamb v. Feehan (Mo.), 276 S. W. 71; Barnett v. Clark (Mo.), 252 S. W. 625; Furman et al. v. St. Louis Union Trust Co. et al., 338 Mo. 884, 92 S. W. (2d) 726; Arfstrum v. Baker (Mo.), 214 S. W. 859; Gipson v. Owens, 286 Mo. 33; 226 S. W. 856; Kidd v. St. Louis Union Trust Co., supra; Jenkins v. Gordon (Mo. App.), 256 S. W. 136; Asbury v. Hicklin, 181 Mo. 658, 81 S. W. 390; Thornton v. Miller (Mo.), 151 S. W. (2d) 1101; Benjamin v. Cronan, supra; Wales v. Holden, 209 Mo. 552, 108 S. W. 89.]

 In this connection it is well to recall the established rule of this court in all equity cases. We, of course, try such cases de novo; that is, we take the entire record made below and from it form our own opinion as to the facts. In doing so, however, we pay due deference to the findings of the chancellor and we do not ordinarily refuse to follow his findings unless we deem them clearly contrary to the weight of the evidence. [Kingston v. Mitchell (Mo.), 117 S. W. (2d) l. c. 229, and cases cited.] The reason for this is obvious. The chancellor has the opportunity to see the witnesses in person and to hear their testimony, while we must form our conclusions from the printed record. He is therefore in a much better position than we are to judge as to the credibility, intelligence, etc., of the witnesses before him. While, of course, this rule would not apply if substantially all of the record in the trial court consisted of depositions and documentary evidence, that is not the case here. A large number of the witnesses in this case testified orally before the chancellor and we must therefore give considerable weight to his findings of fact.

Appellant insists that we cannot apply the rule of due deference here because the chancellor found that under Item 7 of Henrietta A. S. Borck's will plaintiff was sufficiently mentioned to prevent her from being a pretermitted heir and that therefore his decision on the question of adoption was moot. We do not so consider the case. The chancellor had before him two questions, and he has found for the defendants on both questions. In spite of the fact that he did not make any separate findings of fact and conclusions of law, apart from what is stated in the decree, it is clear that he actually found the facts against the plaintiff on the adoption issue.

 If any contract of adoption were actually made in this case, the offer to adopt is to be found in the conversation of Dr. Edward Borck with the witness Meyer had in 1908 and in his letters to the witness Meyer written shortly after that conversation. Assuming that such offer was accepted by the plaintiff when she came to St. Louis, this would at most show a contract between Edward Borck on one part and the plaintiff or her guardian on the other. Henrietta

Borck could be bound by that contract only if it be shown that Edward Borck in making the offer acted as her duly authorized agent or that he purported to act as her agent without actual authority and that she later ratified such act. While the witness Meyer at first testified that Henrietta Borck was present during the conversation between her husband and himself, he rectified this mistake on cross examination. Furthermore, it can certainly not be said that the words spoken in that conversation constitute an offer to have both of the Borcks adopt the girl. Reasonably construed, the offer was one to have the girl adopted by Edward only. It is difficult to see how such an offer could have been later ratified by Henrietta. Appellant insists that her evidence shows that prior to this time Henrietta wanted to adopt her; but this circumstance, taken alone, is far from sufficient to prove that Henrietta authorized her husband to enter into an adoption contract. Nor is appellant's case strengthened by the fact that Henrietta told Charles Weinmann that her husband would write for her to him about the adoption. This was not an authority to the husband to write to Meyer on behalf of his wife. Nor can we conclude from the fact that Henrietta stated after the children had come to St. Louis that she was glad she was going to get to adopt Theresa, that she had authorized her husband to enter into a legal contract of adoption or that she was ratifying his purported agency in that regard. Certainly the evidence offered does not meet the requirements laid down in our cases above cited in that it is not clear, unequivocal and entirely convincing. In the absence of such evidence we could not hold that a contract to adopt had been proven. Certainly we would not be justified in saying that the chancellor's finding to the contrary was clearly against the weight of the evidence. We, therefore, hold that plaintiff has failed to prove a contract of adoption made by the decedent Henrietta A. S. Borck.

The decree below also found that under Item 7 of the Joint Will of Edward and Henrietta A. S. Borck, which was probated as Henrietta's Will, sufficient mention of plaintiff was made so that even if she had been an adopted child she would not be entitled to inherit as a pretermitted heir. Since we have found that Theresa was not adopted, it will be unnecessary, as far as she is concerned, to examine into the correctness of this portion of the decree. It is true that this part of the decree also affects the rights of the third party defendants, but they have not appealed and are not before this court and we are not called upon to determine their rights.

The conclusion, therefore, follows that the decree of the chancellor was for the right parties and that the judgment below must be and it is affirmed. All concur.