Nolan TAYLOR, Appellant,

v.

Gwendolyn Peggy TAYLOR, also known as
Mrs. Robert Brown, Respondent.

No. 43759.

Supreme Court of Missouri.

Division No. 2.

Sept. 13, 1954.

J. L. London, St. Louis, Louis L. Hicks,
Clayton, for appellant.

Michael J. Doherty, Frank C. Boland,
St. Louis, for respondent.

LEEDY, Judge.

Suit in equity by Nolan Taylor, as plaintiff, against his divorced wife, Gwendolyn Peggy (now Gwendolyn Peggy [Mrs. Robert] Brown), as defendant, to have himself declared the owner of a one-half interest in the house and lot here in controversy, title to which stands in defendant's name, and to have a lien impressed thereon in his favor, for an accounting and for other relief. Decree for defendant, and plaintiff appealed. We will continue to refer to the parties as they were designated in the trial court.

In essence, the theory of plaintiff's claim is that the property "was bought and fully paid for" by himself and defendant jointly out of their joint earnings and efforts; that *he* understood they were joint owners and holders of the property as husband and wife, but that the defendant, deceitfully and fraudulently, and in disregard of plaintiff's rights and his interest in said property, and without plaintiff's knowledge, took title in her name only; that he believed that the title was held in their joint names, and did not discover otherwise until "shortly after" they were divorced. A similar claim was made with respect to a savings account which stood in their joint names, i. e., that it was money jointly accumulated by them,

which defendant withdrew without plaintiff's knowledge or consent. Plaintiff's petition prayed an accounting of the funds so withdrawn.

Defendant's answer denied the allegations of the petition, and averred that the property was purchased by her, and that the funds she used for that purpose "were her sole and separate estate, and were accumulated from her own earnings;" that plaintiff at all times knew that the property was in her name, and that it was her sole and separate estate, and that she paid all taxes thereon; and that the first knowledge she had of plaintiff's demand was the institution of this suit.

The real estate involved is a dwelling located at 2822 Lemp Avenue in the City of St. Louis. It was acquired May 12, 1943, and thereafter occupied as the family home for a period of four or five years during the continuance of the marriage. The bank account, for the proceeds of which ($1,158) plaintiff seeks an accounting, was in the savings department of Jefferson-Gravois Bank of St. Louis. The records of the bank show that it was originally opened in the name of the wife alone on Oct. 6, 1942, with a deposit of $100; and that on Nov. 14, 1942, a deposit of $277 was made, and the husband's name added under a codepositor clause, making the account a joint one, thus "Peggy Taylor or Nolan W. Taylor, either or the survivor." Admittedly, there was a withdrawal of $350 from the account on May 11, 1943, the day before the real estate transaction was closed. Plaintiff testified that he derived a net of $325 from the sale of his Chevrolet, and that such sum together with the $350 withdrawn from the savings account went to make up the $500 down payment on the home, and the balance (about $200) was expended for furniture for the new home. The wife concedes that $200 was derived from such sale, and insists that the latter amount, together with $77 of her own funds, represents the deposit shown by the entry of Nov. 14, 1942, when the husband's name was added to the account. Whether the account was built up exclusively out of the wife's

separate earnings (except for the $200 item just mentioned) or whether it represented pooled funds of both spouses is a point of sharp dispute, and one which the evidence does not conclusively establish either way.

Plaintiff and defendant were first married in 1929. She divorced him in 1935, and was awarded the custody of their minor child, a daughter. They were remarried about five months later, and lived together, as we understand it, until about the middle of 1948, preceding their final divorce on June 3, 1949, when a decree went to the wife, with custody of their son, then 11 years of age. Both husband and wife were employed.

The deed to the property is dated May 12, 1943. The former owners conveyed by general warranty deed to Gwendolyn Peggy Taylor. The evidence disclosed nothing with respect to the contract of sale, not even whether it was oral or in writing. It appears by inference that the purchase price was $3,450, $500 of which was represented by the cash down payment, and the balance, $2,950, was money borrowed from Walter and Hilda Haas, for which plaintiff and defendant jointly executed their ten promissory notes, the first nine of which represented semi-annual payments of $100 to be made on the principal together with interest on the loan to their several maturity dates, and the tenth one, for $2,091, represented the balance of $2,050 principal to be due at the maturity of the loan, May 12, 1948, plus accrued interest thereon. These notes were secured by a deed of trust on the property, which deed of trust was likewise executed by both husband and wife. The insurance policy stood in the names of both parties. The record is entirely silent as to who wrote the insurance, or why it was taken in both names. However, it appears that a loss occurred, and the insurance company paid the loss, $730, and the check therefor was endorsed by both plaintiff and defendant and turned over to the contractor who had repaired the damage. It further appears that on or about May 12, 1948 (at which time there was a balance due of $1,400), the note

and deed of trust were extended for a period of three years. There was a later renewal agreement, dated May 12, 1951, but it was signed only by Gwendolyn Peggy Taylor Brown, she having in the meantime been divorced from Taylor and married to Brown. We understand the unpaid balance at that time to have been $700. On Nov. 15, 1951, a payment of $100 was credited, leaving a balance of $600, which appears to be the sum still due at the time of trial.

Plaintiff's earnings as a postal employe averaged $90 to $100 every two weeks; he was so employed during two periods, 1935–1942, and 1946–1947. He made $60 to $70 a week as a carpenter's helper at "Busch-Sulzer" during 1943–1946. He worked five months in 1945 for Hyde Park Brewery; was unemployed during the latter part of 1945, and drew unemployment compensation. He also worked some as a taxi driver, but his earnings from that occupation were not shown.

Plaintiff called only three witnesses in support of his claim, viz., himself, his twenty-two year old daughter and Mrs. Alma Oestricker. His showing in relation to the crucial aspects of the case (the extent of his contributions toward the purchase of the property and to the joint savings account and the agreement between himself and his wife in those respects) was very meager. His own testimony thereon may be summarized as follows: He stated that until 1947 he always brought his pay home and gave it to his wife, keeping out lunch and expense money such as for gasoline; that he sold his car which netted $325, and that this sum was applied on the down payment made on the house. He admitted he personally made no payments on the property, or the indebtedness against it (that is, in the sense of delivering the money); nor did he personally make any of the deposits in, or the withdrawals from the bank account, his testimony being to the effect that "she always went to the bank. She always taken care of that business. * * * She would bring it home, and

I would take it and pay the bill, or she would take it and pay the bill. * * * She drawed the money. * * * We would pool our money together. She had separate compartments in her billfolds. She would show me this and that, and tell me, 'This is for the house. This is for groceries, gas and electric, and different bills.' * * * When I handed it [the money] to her, she would fix it up for the bills. * * * She would have the money in her purse and say, 'That was money to pay Mr. Haas.' Q. Where did she get the money? A. It was pooled money that we put in together." The only direct inquiry made of plaintiff respecting the understanding of the parties in reference to the purchase of the house (with the conclusion of the witness stated in reply) will be found in this excerpt: "Q. (By Mr. London) Now, Mr. Taylor, in connection with the purchase of the house, did you have any conversation with your former wife as to how the house was to be bought and how it was to be handled? A. It was supposed to be our home. That's the way I understood it." He further testified that he was not aware of the fact, and did not discover it until 1950 (after the divorce in 1949), that title had been taken in the name of the wife alone; that such discovery was made when, upon the advice of his present counsel, he inspected the records in the Recorder's Office.

On cross-examination, it was developed that the real estate transaction was closed May 12, 1943, at the then residence of plaintiff and defendant, 2815 Salena. Present thereat, in addition to plaintiff and defendant, were Mrs. Haas, Elmer Marx, the real estate agent, and his secretary who acted as notary. The witness denied that he knew at that time that the property was being placed in the name of his wife. Asked if he remembered Mrs. Haas saying on that occasion that the property was "in the name of Mrs. Taylor only," the witness replied, "I told them I wanted the place." He also denied hearing Mr. Marx say, "This property is being placed in the name of Mrs. Taylor only." Six tax receipts were produced (all made out

in the name of the wife alone) which the witness admitted having examined "as they came in from 1944 on," but he did not remember in whose name they were, nor were his suspicions as to the title aroused by them. He was represented by counsel when his wife secured the divorce decree in 1949, but he denied that there was anything said at that time about this property.

It was further developed that the net amount turned over to the wife from his postal earnings did not exceed $35 or $40 a week. He left home in 1948 (inferably about midyear), and for four or five months prior to his leaving he gave his wife only $20 a week. After he left, he reduced this to $10 a week. The household consisted of the parents and two children. The oldest child, the girl, was perhaps twelve at the time the house was purchased, and the boy four.

The daughter, Mrs. Betty Jeanne Opp (22 years of age), testified that she moved from the home in October, 1948; that prior to that time and while she was living at home she saw her father regularly turn over his pay checks to her mother. It appeared on cross-examination that the witness was not on very friendly terms with her mother. On the other hand, she was living in the same house with her father, and had been for a period of two years. Her testimony was weakened considerably by other matters of self-impeachment developed on cross-examination.

Betty Jeanne's sister-in-law, Mrs. Alma Oestricker (plaintiff's other witness), testified in substance as follows: That she was a long-time friend of the defendant and visited in the Taylor home frequently; that before the house was purchased, defendant told her that plaintiff had sold his car, and that they were going to use part of that money for the down payment, and if they couldn't raise the rest, they would have to make a withdrawal out of their joint bank account. She further testified that three or four months before the divorce defendant told her the house was in her (defendant's) name, "but she didn't want Mr. Taylor to know about it."

On cross-examination, the witness denied she ever at any time discussed the case with the plaintiff, although she visited in the home of her brother, where plaintiff also lived, several times every week; that the first she knew about it was when called by plaintiff's counsel to come to his office. Asked what statement the defendant made to her about buying the property, the witness answered, "She said they were tickled to death, they was very enthused, they were buying a home, her and Mr. Taylor together." She further stated, "I would be there [at the Taylor home] on a payday and he would bring his money home and they would sit down and figure out their money in the kitchen. I would go in the other room and leave them in the kitchen." Elaborating on the statement purportedly made by defendant concerning the title, witness gave this further testimony: "She [defendant] said it was in her name, and she was going to keep it that way, and that Mr. Taylor was just out of luck."

On re-direct examination, the witness testified that defendant told her, in referring to withdrawing the money from the bank, "she [defendant] said she was going to pull a smart one. I said, 'What do you mean?' She said she was drawing the money out and 'he don't know it.' I said, 'What do you intend to do with it, beings you drew it out?' and she said, 'I'm going to put it in J. C. Penney savings account,' and that's apparently where it went."

On further cross-examination, she fixed the time of the conversations with reference to the title and to the withdrawals as having been "in the latter part of 1948 or the beginning of 1949, two or three months before the divorce."

Defendant's showing was directly opposed to that made by plaintiff. Since her marriage to Brown in 1950, she has lived in Rochester, New York. There is no dispute as to the fact that she, too, was a wage earner both prior and subsequent to the purchase of the house. Except for

a period of about three months, she was continuously employed from August, 1941, until the separation. Her first employment was at Bemis Mills at $30 a week until May 1, 1943. She testified that during that time she bought from her own earnings bonds worth "around $250.00." On Aug. 1, 1943, she went to work for the J. C. Penney Co. at $53 a week, and, as we understand the record, she continued to be so employed, and at that figure, as long as she and plaintiff lived together as husband and wife.

She testified very positively that after first learning from Mr. Haas that the property would be for sale, she talked with her husband and told him she was going to buy it; that she told him at that time (March or April, 1943) that the title would be in her own name, which was agreeable with him; that they had no conversations about it after it was put in her name; nor did he ever request her to put the title in his name. She testified that at the closing of the real estate purchase, and in the presence of the persons there present, "We told Mr. Marx it [the title] was to be put in my name." Asked, "Who is we?" the witness answered, "We had agreed on that. Mr. Taylor and I had agreed it would be in my name;" that the purpose in so doing was "because I had to pay for it;" and that plaintiff voiced no objection then or at any time thereafter.

With respect to the bank account, defendant testified that from the time it was opened until the date of the trial, the only money of her husband to be deposited in the account was the $200 item heretofore referred to as having been derived from the sale of a Chevrolet automobile; that this was shortly prior to Nov. 14, 1942, when "he had a couple of hundred dollars, and he wanted me to add his name to the bank book, so he could put the two hundred dollars in." Apart from the final withdrawal of $1,158, there were only four others in the five years and four months (1942–1948) the account was maintained. One of these was the down payment on the house of $350; another for $325, the plaintiff concedes went toward the purchase of a car for his use and benefit; the one of $162 on June 12, 1942, was shown to have been for furniture for the newly acquired home; and the other one, for $70, defendant testified she withdrew and turned over to her husband for his own private purposes, and this he did not deny. She further testified that shortly before she withdrew the $1,158, her husband had some extra money, and wanted the bank book so as to deposit it, but she demurred, her exact testimony in that connection being, "I told him no, that we would never mix our money again. What was in the bank was mine." The witness denied that she and her husband pooled their funds. On the contrary, she testified that in addition to the $350 withdrawn from the savings account, she cashed her own bonds to make up the balance of the $500 down payment on the house; and that she thereafter paid the notes (to Mrs. Haas) and also the taxes on the property out of her own earnings, and that her husband contributed nothing toward such payments; that she kept the money her husband turned over to her (which was always in cash, and never in the form of a pay check) in a purse, and that she used that money to pay household expenses, it being necessary at times to add thereto from her separate earnings. Admitting that she withdrew $1,158 from the bank account on Jan. 27, 1948, leaving a balance of only $1.04, she justified this action on two grounds: First, that it was her money, and secondly, because her husband had told her the day previously that he intended "to go to the bank and see why he couldn't draw it out."

Defendant was strongly corroborated by Mrs. Haas and Marx, the real estate agent, as to the fact that at the closing of the real estate transaction, the matter of the title being taken in her name was discussed in the presence of her husband, and he made no objection. Marx testified that the papers were prepared in his office, and that he called plaintiff's "attention to the fact that the property was in his wife's

name, and he would have to join in on the signing of the deed of trust to make it legal; * * * that the deed of trust has to be signed by both wife and husband as having the dower interest. The title wouldn't give clear title unless the husband joined in on the deed of trust." His explanation of his reason for asking plaintiff to sign the notes secured by the deed of trust was "because the title company required it." Defendant continued to live in the property until March, 1950, when she turned it over to a real estate company to be rented. It is presently rented, and the rents are being held by the rental agency. Defendant denied having made the statements attributed to her by plaintiff's witness, Mrs. Oestricker.

 Plaintiff insists that this case is ruled by Proffit v. Houseworth, 360 Mo. 947, 231 S.W.2d 612. True, there are similarities in the facts of the two cases, but they are by no means parallel. Little, if anything, would be gained by a discussion of the authorities, there being no dispute as to the applicable law. Of course, if the property was acquired in such circumstances that the wife, as the holder of the legal title, may not in good conscience retain the beneficial interest, equity would convert her into a trustee. Limitations of space make it impracticable to set out all of the bits of testimony which may have impressed the chancellor as weakening plaintiff's case, and strengthening the defense. Enough has been detailed to show that basically all that is involved is the weighing of facts. The evidence on both sides is meager and unsatisfactory in some respects, but the burden of proof was upon the plaintiff. The evidence was, for the most part, oral, and upon that evidence the finding went against plaintiff. The record is not such as to compel the conclusion that the wife abused a confidence reposed in her by her husband, or that she is the subject of reproach for having plotted a fraud against him. We think the case is one calling for the application of the doctrine that deference will be paid to the findings of the chancellor where, as here, they are

not clearly contrary to the weight of the evidence. Niehaus v. Madden, 348 Mo. 770, 778, 155 S.W.2d 141, 145. Judgment affirmed.

DEW and STONE, Special Judges, concur.