## GRANTHAM v. GOSSETT et al., Appellants.

### Division One, June 20, 1904.

1. **FOSTER CHILD: Agreement to Will Property To.** An oral agreement by a foster parent with the parent of a small child, to take her into his family as a member thereof, to maintain and educate her, to treat her in all respects as one of his children, and to make her an equal heir with them, when proven according to the standard of proof required, and shown to have been performed on the part of the parent and the child, will be decreed to be specifically performed, when to suffer it to go unperformed would be to suffer a fraud to be perpetrated.

2. ———: ———: **Necessary Proof.** An oral contract by a foster parent to take a child into his family, treat her as his own child and let her share in his estate equally with his own children, must be proven by proof so clear, cogent and convincing

as to leave no doubt in the mind of the chancellor, not only that a contract of the general nature alleged was made, but that the particular contract as alleged was made, and its terms and conditions must be clearly shown.

3. ———: ———: ———: **Contract to Adopt.** A contract to adopt a child is not a contract to make a will in the child's favor.

4. ———: ———: ———: ———: **Abandoned at Trial.** Where one count sets up an agreement by the foster parent to adopt plaintiff and the trial court finds against her on that count and there is no appeal by her, the appellate court will assume that there was no contract to adopt.

5. ———: ———: ———: ———: **Many Witnesses: Corroboration.** Where five witnesses testify as to an oral contract made between a child's parent and its foster parent as to the terms upon which it was received into his home, and no two of them testify as to the same contract and no two of them were present and heard the same conversations with the foster parent, and no reference was made in any conversation to a similar agreement, they can not be said to corroborate each other. In such case the proof is no stronger than the testimony of the strongest witness.

6. ———: ———: ———: ———: ———: **In This Case.** The child's father had abandoned his three-year-old daughter in the streets of a town and she found a home with the father of defendants. A year or two later her father returned and claimed her. One witness testified that the child's father and its foster father casually met on a sidewalk near the latter's place of business and that the latter agreed that "he would raise her as his child and she should be one of his heirs;" another, that an agreement was made in the road in front of the foster parent's house that "when he died she should share equal share with the rest of his children—something like that;" another, that the agreement was made in the parlor of the foster parent's home and that he "told my father that he would will her at his death equal share with his children." These conversations had occurred from 35 to 37 years prior to the trial and neither witness could remember any other circumstance or incident of the occasion, and all stated that they could state only the substance of the conversations. *Held,* that this testimony falls far short of the proof necessary to show that there was a particular agreement by the foster father to make a will by which he would give the foster child a child's share in his estate.

Appeal from Jackson Circuit Court.—*Hon. E. P. Gates,* Judge.

REVERSED AND REMANDED (*with directions*).

*Jas. F. Mister* for appellants.

(1)   There is no satisfactory proof (nor indeed any proof), either of a contract "to adopt" (or of an actual adoption), or of a contract "to give a child share in estate." Neither the "family" witnesses or the corroborative witnesses (if they may be so called or designated), make up, either separately or in combination, a coherent, consecutive, probable story. They contradict each other and are self-contradictory, and are all, and each of them, upon all the canons of evidence, unworthy of belief. It is utterly impossible, upon either of them, or of all of them together, to construct a foundation for the basis of any decree which the law authorizes to be rendered; or for the granting of relief as of a meritorious cause of action. This sufficiently appears from a short analysis of the stories, respectively, of the witnesses, along with the contradictory and corroborating evidence of other witnesses, in the order of their introduction at the trial. (2)   Neither is there anything in this case which entitles plaintiff to the relief asked, or any relief, because of not coming within the purview of facts within which such relief can be granted; the so-called agreements testified to by Ed Triplett and others, being treated as unworthy of belief of themselves (as expressly stated by the trial judge in rendering the decree in this case), and the claim resting altogether upon the admission by Wilson in the conversation with Whitmore as reported by him in his deposition; he does not claim that Wilson gave him the "terms of the agreement," but expressly states that he did not.

*C. O. Tichenor* also for appellants.

(1)   The proof of the contract must be so cogent, clear and forcible as to leave no doubt in the mind of the chancellor as to its terms and character.   There must be like proof that the acts done unmistakably refer to and result from that contract.   There must be no equivocation or uncertainty in the case.   It must be in terms a contract, and not a mere declaration of intention or expectation.   In fine, there must be a contract definitely and conclusively proven.   Casual and loose conversations, when not supported by other evidence, are entitled to little, if any, weight.   This is dangerous testimony; is looked upon with jealously and should be weighed in the most scrupulous manner.   Agreements of this kind are looked upon with suspicion and ought not to be encouraged.   These agreements are within the statute of frauds and are sustained only where it would work a fraud if one party was allowed to plead it.   Goodwin v. Goodwin, 172 Mo. 48; McElvain v. McElvain, 171 Mo. 257;  Kinney v. Murray, 170 Mo. 700;  Steele v. Steele, 161 Mo. 575; Curd v. Brown, 148 Mo. 92; Fanning v. Doan, 139 Mo. 411; Nunacky v. Berger, 133 Mo. 42; Teats v. Flanders, 118 Mo. 669; Cherbonier v. Cherbonier, 108 Mo. 264; Emmil v. Hayes, 102 Mo. 195; Veth v. Gierth, 92 Mo. 104; Reed v. Morgan, 73 S. W. 381; Drake v. Lanning, 49 N. J. Eq. 459; McTague v. Finnegan, 54 N. J. Eq. 457; Woods v. Evans, 113 Ill. 191; Neals v. Gilmore, 79 Pa. 425; Miller's Estate, 136 Pa. 249; 8 Am. and Eng. Ency. Law (2 Ed.), 1017; Nickerson v. Nickerson, 127 U. S. 676; Purcell v. Miner, 4 Wall. 517; Williams v. Morris, 95 U. S. 444; Maddison v. Alderson, L. R. 8 App. Cases 467.   (2)   In order to sustain such a contract there must be something for a consideration, which is "incapable of computation by any pecuniary standard."   In this kind of contract for consideration  there is a surrendering by a father or mother of the child and its influences; the transferring

of its affections; the sundering of the closest of ties; the affectionate services and care where people are aged; the impossibility of restoring a party to his former condition; the value of all which can not be measured by dollars and cents. Healy v. Simpson, 113 Mo. 347; Gupton v. Gupton, 47 Mo. 45. (3) What the Wilsons did for this child resulted from charity and not from contract. Shehan v. Swan, 48 Ohio St. 39.

*Milton & Goodwin, W. L. Stocking, W. C. Culberson, Wm. H. Wallace* and *T. B. Wallace* for respondent.

(1) There is but one question in this case and that is whether the alleged contract is proved. There can not be any controversy as to the law of the case. The principles governing this class of cases are well established in this court. The law does not change every five minutes, and the later decisions of this court, some of which are referred to by the appellant, have not changed the law. If the contract is established to the satisfaction of the court, the plaintiff is entitled to the decree, and that is all there is to the case. Performance on the part of the plaintiff and of her father is so well established that nothing further need be said about it. That Wilson had such benefits and advantages as grew out of the relation established between himself and the child, and that Triplett relinquished his right as a parent, is not disputed by anybody. That Wilson himself performed the contract to the extent of treating the plaintiff as his daughter and holding her out to the world as such, is admitted by appellant's counsel in the briefs. Nor is it disputed that the plaintiff did her part as a daughter to Mr. Wilson. In addition to the performance of household duties, she was obedient and affectionate, she gave him those little attentions which are expected from children by parents in the household, and for many years she was the only companion these old people had, remaining with them after their own children had gone away, and until her marriage which took place

under their sanction.    Admitting the contract the plaintiff is entitled to the relief.    Wright v. Tinsley, 30 Mo. 389; Gupton v. Gupton, 47 Mo. 37; Sutton v. Hayden, 62 Mo. 101; Sharkey v. McDermott, 91 Mo. 647; Healy v. Simpson, 113 Mo. 340; Norweck v. Berger, 133 Mo. 24; Lynn v. Hockaday, 162 Mo. 111; Wright v. Wright, 99 Mich. 170; Van Dine v. Vreeland, 11 N. J. Eq. 370; Van Dine v. Vreeland, 12 N. J. Eq. 140.    (2)  The agreement sued on is abundantly established by the evidence. It was made in the presence of the plaintiff, Mr. Wilson, and Ed Triplett at the Wilson home, when Triplett came for his daughter after having made several prior efforts to get her which were unsuccessful.    It was repeated in the presence of Solomon Jones at Wilson's gate, and it was again repeated in the presence of William M. Jones, the Methodist minister.    It said that the testimony of these witnesses to an event which took place so long ago is weak, but they testify to the event clearly.    Two of these witnesses at this time were ten or twelve years of age, and the other a young man.    That they were young at the time is no reason why they should not remember the event.    All of us can recollect clearly many events which took place when we were only two or three years of age.    These witnesses were old enough to understand the nature of the transaction.    And who would ever forget such a transaction as that—i. e., the giving away by a parent of his child?    It is true that these witnesses do not remember other things which occurred about the same time.    But they were unimportant circumstances which were not calculated to impress themselves on the mind.    But the fact of the contract does not rest upon the testimony of these three witnesses alone.    It was admitted by Wilson to the butcher, John Hoag, who first had the child, and in the presence of John G. Thompson who was a real estate owner and man of standing in the community.    The assertion that "Thompson came to the State to have his deposition taken" is untrue. He lived at the time in Shawnee, Kansas, and was summoned to ap-

pear in Kansas City, Kansas, and on the day the deposition was to be taken the place was by agreement changed to Kansas City, Missouri, and he voluntarily came over without a subpoena. The fact of the agreement together with all the surrounding circumstances, was voluntarily stated by Wilson to Mr. Whitmore, manager of the Baltimore Hotel, during the same year in which Mr. Wilson died, and while Mr. Whitmore says that Wilson did not undertake to specify the terms of the agreement, the agreement as stated by Wilson to Whitmore contained all the terms there were to the agreement as testified to by the other witnesses, and all the terms necessary to the enforcement of the contract in a court of equity. There is no escape from the testimony of this witness. He was a man of position and respectability, being manager of the Baltimore Hotel and vice president of the Hotel Company. He was disinterested. The contract had not been broken at this time. The breach did not occur until Wilson's death. The plaintiff had no reason to apprehend that it would be broken. Mr. Gossett, the administrator of Wilson's estate, testified to having a short conversation with Whitmore as to what Wilson said on the accasion referred to. Gosset does not contradict Whitmore, but said that as he recollected the conversation Whitmore testified to the statements of Wilson more fully in his evidence than he gave them to him in the short talk he had with him. The agreement is further confirmed by the acts of Wilson during a period of seventeen years in holding the plaintiff out to the world as his daughter, introducing her as such, stating that she was his adopted daughter, changing her name; and is also confirmed by the daily life of these parties for the same length of time. These acts are consistent with the fact that she was taken into the family as a daughter and inconsistent with the theory of the defendant that she was taken as an object of charity or as a servant to work for her board and clothes.

VALLIANT, J.—This is a suit against the personal representatives and heirs of R. T. Wilson, deceased. The petition is in two counts. The first count states that when the plaintiff was a very young child, an agreement was made between her father and Mr. Wilson that the latter would adopt the "plaintiff as his lawful heir under the statutes of the State of Missouri;" whereupon her father delivered her to Mr. Wilson who received her in his family, where she was reared as his own child, dropping her own name, which was Mary Elizabeth Triplett, and taking that of Minnie Wilson; that she continued to live in the family for a period of fifteen years, until she was married, and went to live with her husband in West Virginia; during her life in the family she demeaned herself as a dutiful daughter and received from Mr. Wilson and his wife the care that dutiful parents bestow on their children and the same that they bestowed on their own children; that she was everywhere in their social circle recognized and known as their adopted daughter; she married with the consent and approval of her adopted parents, always supposing that she had been regularly adopted according to law and did not discover until after Wilson's death that no deed of adoption had in fact been executed as the statute requires; that the contract was fully performed on the part of her father and herself, and she prays a decree that it be specifically performed by the defendants.

The second count is in all respects like the first except that the contract alleged is not one to adopt the plaintiff, but it was that Mr. Wilson would take the plaintiff into his family as a member thereof, would maintain and educate her, treat her in all respects as one of his own children, and that she should share in his estate the same as though she was his own child; the prayer is for a specific performance of that agreement.

The statements as to the contracts were denied by the defendants in their answers.

The testimony on the part of the plaintiff tended to show as follows:

The plaintiff's father moved from Illinois to Kansas City in the spring of 1865. He came in a covered wagon, bringing his family, which, besides himself, consisted of his three children, the oldest a boy then about eight years old, the two others girls; the plaintiff was the elder of the two girls, she was probably then about six years old. The mother of the children was dead. The father was very poor. He remained in Kansas City during the summer and fall of that year, and in the early winter moved to Kansas, taking the boy with him but leaving the two girls, with whom or on what terms he left the little girls the plaintiff's evidence does not very clearly indicate. It appears that they drifted or in some way came under the roof of a butcher named Haag through whose instrumentality one of them, the plaintiff, was taken into the home of Mr. Wilson, and the other into that of a Mr. Miller.

The father, Triplett, went to Kansas and there married. His condition, however, showed no improvement, his surroundings were poor. In the course of time he had a child of his second wife, and shortly after that he came to Kansas City and to the residence of Mr. Wilson and demanded his child, the plaintiff. At that time Mr. Wilson was absent from home, had gone east, but Mrs. Wilson saw Triplett and talked with him about the child. She stated to him that they had become attached to her and she to them and that they were reluctant to give her up. But he insisted and Mrs. Wilson told him that she would get the child ready and send her to the railroad junction to meet him and this she did, sending her in charge of her son. After the plaintiff was left at the station, before her father arrived, she ran away and went to the home of Mrs. Swaney who lived near and besought her to hide her from her father, which was done and he returned to Kansas without her. After that she got back into the Wilson family again and re-

mained there fifteen years until she married and went with her husband to live in West Virginia.

The testimony shows that during all the years of her residence in the Wilson family she was treated with kindness and affection, in all respects as if she was Mr. and Mrs. Wilson's own child, no distinction in her treatment was shown that of their own children, she was called Minnie Wilson, many of the acquaintances of the family supposed she was their child. Under this care she grew up to be a refined, educated, good woman and was married from the home of her foster parents, and in turn she behaved as a good daughter to them.

The testimony offered to prove the alleged contract was as follows:

W. W. Jones, who was a brother of Triplett's second wife, stated that he was in the habit of going with Triplett to Kansas City occasionally with a load of grain or hay, that on one of these trips he and Triplett were together on the street and they met Wilson, it was on the sidewalk near Wilson's place of business, it was a casual meeting, Triplett expressed a wish to take the girl home with him, Wilson seemed rather loath or unwilling to give her up, said he would rather not give her up, that she had been in the family until they had become attached to her and she was as one of the family and he "proposed to Triplett that if he would let the girl remain there as their child, that he would take care of her and raise her as their child and that she should be one of his heirs, with his other children—that she should fare and share with his children—his own children. . . . When he made that proposition Triplett said that under the circumstances, he had about as much family as he could well care for, and she had a good home there and if he would raise her with his children, as one of the children, make her one of his heirs with his children, why he would agree to leave her there—he would accede to Wilson's proposition." That conversation occurred in 1865-6 or 7, the witness thought

in 1867. On cross-examination he was not sure for what purpose he and Triplett came to town on that occasion or that they came together, it was thirty-five years ago and he could not remember, was not sure where it was they met Wilson, but from best recollection it was on the sidewalk near his place of business, never saw Wilson before and not sure that he ever saw him afterwards, could not describe him. "Q. Were you and Mr. Triplett hunting Mr. Wilson or did you accidentally fall in with him. A. No, sir, I don't recollect how we came to be with him. Q. You didn't go there with Mr. Triplett for the purpose of having a conversation with Wilson then? A. No, sir. Q. You just met him then on the sidewalk? A. Yes, sir. That is my recollection. . . . Q. Now Mr. Jones, in view of these other things that you can not recollect would you undertake to state or give the exact language that occurred between Mr. Wilson and Mr. Triplett? A. No, sir; oh no. Q. How? A. No, sir. Q. You wouldn't undertake to do that? A. No, sir. Q. Did you and Mr. Triplett go out to Mr. Wilson's house at that time? A. No, sir, I don't recollect of being at Mr. Wilson's house. Q. Now, Mr. Jones, can you recollect whether you did or did not go to Mr. Wilson's house at that time? A. No, sir, I can't recollect that, but I don't have any recollection of being at Mr. Wilson's house. . . . Q. Your recollection is then that you did not go there? A. Well, I am undecided about that, I may have went there, I heard a great deal said about this girl and about her being there and I may have been there. I might have been there. I heard a great deal said and I have got some impressions on my mind, but I don't know how they—how I got them. I may have been there and I might not, I wouldn't say that I ever was at Wilson's house. I don't have any recollection definitely of ever being there."

Solomon Jones, a half-brother to the other Jones, came to town with Mr. Triplett with a load of hay, went

with him to the house where the little girl was living, could not remember the name of the family. Triplett went into the house and witness remained on the wagon, in about a half hour Triplett and the man of the house came out to the wagon; "he told Mr. Triplett if he would leave the girl with him . . . . Q. Who said that, do you say? A. The man that was with Mr. Triplett . . . Q. Well, what did he tell him? A. He told him to leave her with him; if he would leave her with him, why, he would treat her as one of his own children and educate her, send her to school, and when he died, if he had anything, that she should share equal share with the rest of his children as near as I can tell—something like that. Q. Did Mr. Triplett say anything? A. I don't recollect what Mr. Triplett said, I don't remember what he did say. Q. What did you all do then? A. Why, he talked a little there, if I remember, and got in the wagon and went home. Q. Did he take the child? A. I never seen any child. . . . Q. About Mr. Triplett, did you notice anything about him? A. They were talking there and I noticed tears. I was small then and I noticed tears in Mr. Triplett's eyes." On cross-examination he said he was born in 1856, this conversation he spoke of occurred in 1867 or 1868. He never saw the man who was talking with Mr. Triplett before and had not seen him since and did not know his name. "Q. Describe Mr. Wilson, or this man that you saw there? A. Well, I don't remember hardly how he looked; he just looked like a man to me, and at times he looked like he was a tall like fellow. . . . Q. Now, tell me just exactly what Mr. Wilson said, I want his exact language? A. Why, he said, 'If you let Eliza stay with us, why I will treat her as my own child and educate her and send her to school,' something like that, and she should 'be treated as one of my children and at my death she should have a share.' Q. Do you undertake to say that he said just those words? A. Something like that. He said that to Mr. Triplett

. . . Q. And this time, they agreed that she should stay there? A. I don't know whether Mr. Triplett agreed she should stay there or not. . . . Q. You went there and this man said what you have repeated here; now tell me what Mr. Triplett said in answer to that; right then and there? A. I could not say; I don't remember what. he did say, but I can remember one thing, he had tears in his eyes; I was small and I thought about the tears running down his cheeks.''

Deposition of J. E. Triplett was read. He is the the brother of plaintiff, was born in Illinois in 1857, came to Kansas City with his father in 1865, went with his father to Kansas where he was reared, at the time his deposition was taken he was forty-three years old, could read a little but could not write. He was asked to state the circumstances under which his sister went to live with the Wilson's. "A. Why, when she first went there it seems to me that she was at another place and they came and took her but these parties I did not know about that time. I do not know. Q. Now do you know anything about who or under what circumstances she first went to the Wilson home, do you remember anything about that? A. No, sir. Q. After you moved over to Kansas, and your father married a second time, do you know whether or not he made any effort to get this plaintiff from the Wilson home? A. Yes, sir. Q. Do you know whether he made more than one effort? A. No, sir; that I know of. Q. Were you with him at the time? A. Yes, sir. Q. Well, just state what occurred? A. We went there after my sister, and to get her, and they did not want to give her up. Said it seemed just like giving up one of the family, and finally did agree to give her up, and Mrs. Wilson went and got her clothes. They told us to start on and he would bring her in a buggy, and we went on and thought they were coming back of us, we went over a little rise and kept looking back to see them but they did not come. My father said he did not know what to think about their

not coming. Afterwards we found where they had turned to the left as I recollect it, there were buggy tracks you know and we did not know where he had taken her." Witness said that on that occasion Mr. Wilson was not at home, only Mrs. Wilson, her son and daughter, and the witness's sister; his father returned to Kansas without the child. A few days afterwards the father returned, witness was with him, they went to the Wilson home. "Q. Who was present at the Wilson home at that time? A. Mrs. Wilson, Mr. Wilson, their son and daughter and my sister. Q. Did you hear the conversation between your father and Mr. Wilson in regard to taking your sister at that time? A. Yes, sir. Q. State what the conversation was? A. My father said he had come after my sister, and was going to take her, and they commenced to plead and say it was like giving up one of the family and Mrs. Wilson commenced to cry, and then Mr. Wilson told my father he would will her at his death, equal share with his children. Q. Did your father reply to this? A. Yes, sir; and after they agreed to this, he gave up and left her there. Q. Did you ever make any other efforts to get her? A. No, sir; not after that time." On cross-examination he said that it was soon after the birth of the child of his father's second wife that they went to Kansas City to get the plaintiff. "Q. Your sister was glad to see you and glad to see your father? A. No, it did not seem like she was. Q. Did she hear this agreement? A. Yes, sir. Q. Well, tell all the conversation. A. I could not tell all of it, I don't suppose, not any more than I have told. She was to share equally with the other children in his property and all. They begged hard to keep her and did not want to give her up. Mrs. Wilson cried about it. Q. Have you told all that was said there, that you can remember? A. Well, I suppose I have. It has been so long that I could not tell word for word you know." No paper was signed and nothing said about signing a paper. Witness had

not seen his sister for thirty years until the trial of this suit.

Attached to the deposition was a letter which the witness had received from the plaintiff which is as follows:

"Martinsburg, Sept. 5, 1898.

"My Dear Brother:

"I suppose you have heard from my attorney ere this, as he said he intended writing to you. I just received a paper from him the other day for me to sign, and it was based on the strength of your letter I sent him. Now, if he does write to you or you should have to go to K. C. this fall, be very careful what you say or write, and stick to what you write to me, in regard to the understanding between Mr. Wilson and father. Just as long as you can testify that there was a verbal agreement between father and Mr. Wilson that they took me as their own and intended I should share equal with their own children I am all right. I will know in a few days if I will have to go to K. C. or not. If I do, you can meet me there and we will talk it over. All you will have to do is to say just what you know will be to my interest and no more. If dear father was only living I would be all right. I don't think there is much doubt as to my winning anyway. I want you to help me to fight for it. The attorney says the evidence is getting stronger all the time; at any rate it is worth fighting for, and if I win I will pay you for your trouble. So let us pray for success, dear brother. Well, it is late and I am tired, so will say good night, with much love to you and yours.

"Ever your true sister,

"MINNIE.

"P. S. When you write please call me Minnie, if you call me by name, as that is the name I always went by and the lawyer wants me to go by that name yet. Now, don't forget, for the other name sounds very odd

to me anyway, for I was never called Eliza by any one. Excuse bad writing; my pen is poor.

> "Mrs. S. S. Grantham.
>
> "Martinsburg, W. Va."

John S. Thompson was a butcher from whom Wilson at the date of the events in question was in the habit of buying meat. Thompson had in his employ John Haag, the butcher with whom the children were first found after their father left them, and who brought one to Mr. Miller's and the other to Mr. Wilson's. Thompson testified to a conversation which he said he heard between Mr. Wilson and Mr. Haag: "Mr. Wilson came into the shop and called for John Haag. He was working for me at the time. I called him out of the back room and Mr. Wilson said to him, says he, 'John, I have got this thing all settled,' and I was present; John says, says he, 'Have you,' and, 'In what way.' 'I have adopted the child and got the papers,' and John says, says he, 'I am glad of it.' 'Now,' says John, 'Mr. Wilson, you intend to keep her?' 'I do intend to keep her,' he says, and he says, says he, 'Mr. Wilson, I want to know what you will do for the child.' As near as I can recollect, says he, 'John, I have adopted that child as my own and I am going to take care of her and raise her and treat her and provide for her the same as my own other children.' John says to him, says he, 'Mr. Wilson, you won't go back on that?' says he, 'I won't. She shall have the division of everything I've got.'" The witness stated that Haag is now dead.

On cross-examination he repeated as the conversation what he had before said, and was asked: "Q. He said in that conversation that he had made an agreement with her father? A. Yes, and got it made in writing. I did not see the writings. Q. Do you mean that he got this agreement about the girl between him and her father in writings? A. Yes. . . . Q. Then Mr. Wilson stated that day that his agreement with the

father was in writing. A. Yes, he stated so that day to Haag in my presence.'' Witness said that the children had been with Haag from three days to a week before he got one of them in the Miller home and the other in the Wilson home. "He told me he got the children and they were in a bad plight, and he thought they needed somebody to take care of them and that was all.''

The deposition of S. J. Whitmore was read. He was an acquaintance of the plaintiff's husband, stated that he had received a letter from him written from West Virginia asking him to call at the Wilson home and inquire the facts concerning the death of Mrs. Wilson; witness did as requested, saw Mr. Wilson whom he had never known before, but who appointed the next morning to meet him at the Midland hotel, which appointment he kept. "I told him that I was asking this interview purely as a favor and that I desired to know when Mrs. Wilson died and the circumstances of her death. He told me the date of her death, and said that he was surprised that Minnie had not received all the facts concerning it, as he had written or authorized to be written, quite a number of letters about it. . . . He seemed quite talkative and pleased to go over the matter with me. . . . He first of all volunteered the information that a will had been left by Mrs. Wilson and that Minnie had shared equally with the rest of the children. . . . He stated that she was the daughter of a man who did not seem able to provide for his family on account of some misfortune, which I don't recall. Mrs. Wilson in some way or other found this little girl, who was probably not more than three years old. I am not very clear as to her age. She took her to her home. . . . Mr. Wilson and his wife took care of this child for some length of time and became very much attached to her. In the meantime the father of the child seemed to have located somewhere in Kansas and got in somewhat better circumstances, and came to Kansas City to

take this child away from them, to take her to his home, it seems. . . . Mrs. Wilson refused to give up the child, but the father insisted and demanded her; as a matter of safety to her she was taken to some neighbor's house and kept in hiding there. In the meantime Mr. Wilson had been notified by telegram, I think; by way of explanation I want to say he was in the east and he hurried home as quickly as possible and personally took hold of the controversy. After a great many conferences and proposals, an agreement was reached whereby the child was taken back to Mr. and Mrs. Wilson's home, to remain there, as their child, with positive assurance to them and to the child that there would never be any more trouble about the matter. He and his wife felt very much pleased over this and they pacified the child, which seemed greatly excited over the incident of the trouble, by telling her that she would never be taken away from Mama and Papa again. Mr. Wilson said that they had given her every advantage in bringing her up and that they were both greatly devoted to her, and that he felt very much like going to see and to spend considerable time with her. In this conversation Mr. Wilson oftened used endearing little terms, such as 'the dear little thing' and 'his little girl.' He cautioned me in particular to communicate to her the things of importance in this conversation and expressed his regrets that I should have been troubled to seek the interview. Q. Can you give the substance of the agreement that you say he said was made between him and the little girl's father? A. The terms were not specified, as I before stated, Mr. Wilson said that an agreement was reached whereby the child became his— that right as I understand it—that was the substance of the agreement. Q. What, if anything, did he say in any part of the conversation he was to do for the child? A. He was to properly raise her, to educate her and give her the advantages and privileges of a child. Q. What privileges of a child was she to have, did he say?

A. As I—all the privileges of a child, and to share equally with the rest of the children? Q. Share what equally with the rest of the children did he state? A. These were the words he used.''

The evidence for the defendants tended to show as follows:

The plaintiff's father abandoned the two little girls —left them in the street near the butcher shop of John Haag. Haag took them in and kept them a few days trying to get homes for them. The younger one, Maggie, he got temporarily into the home of Almon Fernald. After Fernald had kept her about six months, her brother came to see her, and Fernald, learning from the brother that Triplett was near Wyandotte, Kansas, took the boy and girl in a buggy and went to Wyandotte to find the father. He found a house where it was said Triplett lived, but did not find him or any one at the house; he left the little girl at the house of a person who lived near there with the request to have her delivered to her father when he should return. Two days afterwards her father came to Fernald's house in Kansas City, and begged him to take Maggie and keep her, but Fernald declined. A few days after that a stranger brought the child to Fernald, and demanded $1.50 for bringing her, which Fernald declined to pay, but the child was left with him, and the next day he took her to Mr. Miller's, who received her and gave her a home, and she was reared in Mr. Miller's family.

The other little girl, the plaintiff, was first given by Haag to Mrs. Smith, who in a short while got her into the Wilson home.

After the father's marriage in Kansas and the birth of a child, he came to Kansas City and demanded the plaintiff of Mrs. Wilson. The result was Mrs. Wilson told him that as soon as she could get the child ready she would send her to the railroad junction to him, which she did. But as soon as the little girl was left at the station, before her father arrived, she ran away

and sought refuge in the home of Mrs. Swaney, who was a friend of the Wilsons, and whom the little girl knew, telling Mrs. Swaney that her father wanted to take her to Kansas to be the nurse for her stepmother's baby, and begging Mrs. Swaney to hide her from her father, which Mrs. Swaney did, and when the father came he did not find her, but Mr. Swaney severely reproached him for having abandoned his two children. A few days afterwards Mr. Wilson called at Mrs. Swaney's and the little girl begged him to take her home with him, and he did so. She was reared in the Wilson family, educated and cared for by Mr. and Mrs. Wilson, and lived with them until she was married.

The finding and judgment were for the defendants in the first count of the petition, but on the second count the finding and judgment were for the plaintiff, decreeing that she was entitled to a child's part of Mr. Wilson's estate. From that judgment the defendants prosecute this appeal.

There is no difference of opinion between the counsel as to the law of this case. Oral contracts of the kind stated in the petition, when proven according to the standard of proof required, and shown to have been performed on the part of the parent and that of the child, when to suffer it to go unenforced would be to suffer a fraud to be perpetrated, will be decreed to be specifically performed. [Gupton v. Gupton, 47 Mo. 37; Sutton v. Hayden, 62 Mo. 101; Sharkey v. McDermott, 91 Mo. 647; Healey v. Simpson, 113 Mo. 340; Nowack v. Berger, 133 Mo. 24; Steele v. Steele, 161 Mo. 575; Lynn v. Hockaday, 162 Mo. 111; Kinney v. Murray, 170 Mo. 700; McElvain v. McElvain, 171 Mo. 257; Goodin v. Goodin, 172 Mo. 48; Asbury v. Hicklin, 181 Mo. 658.]

The only question before us now is, does the evidence sustain the plaintiff's claim?

The first count in the petition states a contract to adopt the plaintiff under the forms of the statute, and it states that until the death of Mr. Wilson she did not

know that a deed of adoption had not been duly executed and recorded, as the law prescribes. The second count states a contract on Wilson's part to take the plaintiff into his family, treat her as his own child and let her share in his estate equally with his own children.

In all the cases of this kind that have come before this court we have held that to sustain the alleged oral contract the proof must be so clear, cogent, and convincing as to leave no reasonable doubt in the mind of the chancellor, not only that a contract of the general nature alleged was made, but that the particular contract as alleged was made, and its terms and conditions clearly shown. It will not satisfy the requirement to show that there was an understanding of an indefinite character, leaving its terms more or less to inference, that the child was to be taken and reared as a member of the family. A contract to adopt a child is one thing and a contract to make a will in the child's favor is another. If a child is adopted it is entitled to inherit as an heir if the adopting parent should die intestate, but it is liable to be cut out by will, as one's own child is. If there is a valid and enforcible contract to make a will in favor of the child, then although the child will not inherit as an adopted one would, yet it can not be cut off by a will that violates the contract. When a plaintiff comes into court with a case of this kind, there should be no doubt in her pleadings or her proof as to her contract. She should know whether she is claiming as an adopted child or as one entitled to a testamentary provision.

The plaintiff's petition shows that when she brought this suit she was uncertain herself as to her attitude to the Wilson family. She gives us to understand in her first count that she supposed she had been adopted in the form of the statute and did not discover the contrary until after the death of Wilson, and in the second count she states a contract that would entitle her to a share in the estate even if there had been a will cutting her out. Her proof even as far as it goes is also un-

certain as to the terms of the contract. W. W. Jones said "she was to be one of his heirs." Solomon Jones said "when he died she should share equal with the rest of his children—something like that." The brother said "Wilson told my father he would will her at his death equal share with his children."

The trial court having found against the plaintiff on the first count, and there being no complaint of that finding, we may assume that there was no contract to adopt the plaintiff. Does the evidence justify the finding of the chancellor on the second count?

We have been compelled to set out at great length the evidence for the plaintiff, because our opinion as to the character of evidence required to sustain a case of this kind could not be shown in this case unless the substance of the evidence upon which we pronounce judgment is given.

The learned counsel for the plaintiff, conceding that the character of the evidence must be clear, unequivocal, cogent and convincing beyond a reasonable doubt, contend that the evidence for plaintiff measures up to that standard. They say they have proven the contract by five witnesses, three who heard the contract made, and two who heard Mr. Wilson say he had made it. No two of these witnesses, however, testify in reference to the same contract, no two of them were present and heard the same conversation. The testimony of each one refers to a scene and a conversation concerning which there is no living witness except himself; the alleged parties are dead and no other witness now living was present. It can not be said, therefore, that these witnesses corroborated each other. In fact there is an inconsistency in the evidence of any one of them with that of the others. Each one undertakes to state it as the original contract and the conclusion of the matter, no reference being made in either conversation to a similar agreement. The dates are so confused that we do not know which contract purports to have been first in

time.   The words alleged by each witness to have been
spoken by Mr. Wilson in making the proposition were
such as indicated that it was the first proposition he had
made.   If there had been a former agreement on the
same subject it is natural that some reference would
have been made to it.   According to W. W. Jones the
matter was definitely concluded in the meeting on the
sidewalk, the father of the child being so entirely satis-
fied that he did not even go to say farewell to the child
whom he had given over to another, and whom, if that
was the last agreement, he never saw afterwards.   Ac-
cording to Solomon Jones the transaction was concluded
when the men stood by the wagon in front of Wilson's
residence, whereupon the father got into the wagon, left
his child and returned to Kansas.   According to the
brother, after the conversation that he listened to in the
parlor at Mr. Wilson's house, the father left and never
returned.

The plaintiff's proof is no stronger than the testi-
mony of the strongest one of these three witnesses;
there can be no combination of their strength because
each is independent and relate to a separate transac-
tion.   Can it be said that the testimony of either is suffi-
cient in itself to sustain the case?

Each was drawing on his memory to recall a con-
versation that occurred thirty-five years ago, and each
confessed that the lapse of time had caused every other
circumstance connected with the event of which he was
speaking to fade from his memory or be remembered
only with confusion, except the words of that conversa-
tion.   W. W. Jones on cross-examination said he would
not undertake to repeat the language that either party
used and when pressed to state something else that he
remembered of that occasion said that he had heard a
great deal of talk about the girl being at Wilson's and
"I have got some impressions on my mind, but I don't
know how they—how I got them."   It is out of such a

memory, confused on all other points, that comes a recital of an oral contract which we are asked to trust, as proof beyond doubt. The age of that witness is not given, but he was older than his half-brother who was born in 1856. This younger brother was ten or twelve years old when he heard the two men talking at the wagon; he was forty-five when he testified. He undertook to tell what the man who was talking to Mr. Triplett said, but could not remember what Triplett himself said, and after attempting to say what Wilson said, the witness qualified it by saying that it was "something like that." The brother of the plaintiff, who was forty-three years old at the trial, undertook to repeat a conversation he claimed to have heard when he was nine years old. The letter from the plaintiff to him which is shown in the record does not tend to strengthen confidence in his testimony.

The two other witnesses relied on to prove the contract testified, one to a conversation which he overheard, the other to a conversation which he held wherein Mr. Wilson made admissions in regard to the plaintiff's relation to him.

In Pitts v. Weakley, 155 Mo. at page 138, this court expressed its opinion of that kind of evidence. It is so liable to be incorrect owing to the facility with which the witness may have conceived a wrong impression and the difficulty of remembering and repeating the words in the connection and sense in which they were used. Even as to conversations of persons still living it is not regarded as a high grade of evidence, but when it relates to what men who are now dead are said to have said it should be received with caution.

If Mr. Wilson said what these witnesses say he said, his statements were not true. Thompson's testimony was that Wilson said he had adopted the child and had done so in writing. Plaintiff does not claim that there was any deed of adoption executed or that there was any evidence in writing to prove the contract. There was

no evidence of any kind of adoption and the trial court so found.

Whitmore was a stranger to the Wilsons, but had received a letter from the plaintiff's husband, asking him to inquire and write him about Mrs. Wilson's death. He did not keep the letter or his own reply thereto. He had never seen Mr. Wilson before and never saw him afterwards, but in that one interview Mr. Wilson was talkative and told the witness many things. He told him that Mrs. Wilson had by her will left the plaintiff an equal share of her estate with her children, which was not the fact, although she did leave her a legacy. He told him of the plaintiff's history, that "she was the daughter of a man who did not seem able to provide for his family on account of some misfortune which I do not recall." If Mr. Wilson ever told any one of a misfortune that befell the plaintiff's father rendering him unable to provide for his family, he told something that he knew nothing about, and which, so far as the record in this case shows, was untrue. If he told the witness that after Triplett went to Kansas he got in better circumstances, he told him what is not shown to have been the fact. According to this witness, Wilson told him that when the father first came for the child she was sent to a neighbor's and kept in hiding until he (Wilson) returned from the east, and then "after many conferences and proposals an agreement was reached." Comparing these alleged statements with the facts as shown by the plaintiff's own evidence we see the wisdom of the rule which places this kind of evidence in a low grade. The witness was trying to repeat the conversation as he then recollected it, but it is very certain that he did not recollect it correctly, for it is improbable that Mr. Wilson would have made so many statements that he knew were not true.

In our judgment the plaintiff has failed to prove her case.

The judgment is reversed and the cause remanded to the circuit court with directions to enter a judgment for the defendants, dismissing the plaintiff's bill.

All concur, except *Robinson, J.*, absent.