ALBERT DEITZ v. WILLIAM P. DEITZ, RUTH DEITZ, WILLIAM GROHNE, and FLORENCE GROHNE, Appellants.—No. 37999.—172 S. W. (2d) 866.

Division Two, June 7, 1943.

Rehearing Denied, July 6, 1943.

*Johnson, Lucas, Graves & Fane* for appellants.

*Louis A. Laughlin* for respondent.

LEEDY, P. J.—Plaintiff, Albert Deitz (respondent here), brought this suit against his son and daughter, defendants William P. Deitz and Florence Grohne, and their respective spouses (appellants here), to set aside and cancel a deed to certain valuable real estate located in Kansas City which plaintiff had executed some five years previously (September, 1935) in favor of his said children.

Plaintiff claimed fraudulent misrepresentations, a distraught mental condition when the deed was executed, and failure on the part of the children to execute in writing, and carry out an agreement to certain rights reserved to plaintiff which were not expressed in the deed. Decree was entered in plaintiff's favor, as prayed, and defendants appealed, claiming the evidence was in their favor, and that the trial judge had acquired a bias, and had prejudged the case before they had an opportunity to present their defense.

Much of the testimony was conflicting, but we think that the facts as hereafter stated are supported by the weight of the evidence.

The property in question consisted of an apartment building, a store, the Deitz family home and certain other property both improved and unimproved, all located in Kansas City, Missouri. The gross rentals were about $300.00 per month, but taxes and upkeep consumed the greater part of the rentals. The property had been acquired by plaintiff and his wife as tenants by the entirety, and upon the death of plaintiff's wife about a month before the deed in question he acquired full title. Plaintiff's wife had contributed substantially to the acquisition of the property. She had worked in plaintiff's grocery store and after he had retired from business, she had contributed her labor to the upkeep of the property. She was the recognized business head of the family. She had charge of the family purse, and the acquisition of the property was largely due to her savings. Her children considered the Kansas City real estate (as distinguished from the money and securities from the family savings) as having belonged more to their mother than to their father. During her last illness she had demanded of her husband that he convey the property to her children, or at least make proper provision for them after her death, and he had agreed. At the time of her mother's death plaintiff's daughter had been living in Joliet, Illinois, where her husband was in the contracting business. He had managed to scrape through the depression by repair work and painting, assisted by an unpaid loan from plaintiff, which the daughter had obtained through her mother. Plaintiff's daughter asked her father to make his home with her in Joliet, but he refused to leave Kansas City, and her husband wound up his business in Joliet and the family moved to her father's house in Kansas City, where she undertook to make a home for him along with her family.

At about that time her father proposed deeding the property to her and to her brother, and went to Topeka, Kansas, to discuss the matter with her brother, who resided there. Also at about that time the family reached an understanding that their father should have a home, or at least that he would be permitted to live in the house rent free, and that he should have $50.00 per month out of the rentals, which represented approximately the net rentals after proper provision had been made for taxes and upkeep. According to the testimony of de-

fendants this arrangement represented their mother's dying wishes, whereas plaintiff claimed that the principal reason for the deed was an alleged fraudulent statement of his son that if the children had to pay inheritance taxes they would lose the property (which was unencumbered). The son denied making any such statement, but, on the contrary, stated that his father had brought up the question of inheritance taxes and had suggested that his son obtain advice from an attorney on the subject, which the son neglected to do.

Plaintiff had had prostate trouble for some years and after his wife's death his daughter insisted that he see a physician. This resulted in plaintiff entering a hospital a few days after the deed was executed (September 25, 1935) and he thereafter had an operation. Plaintiff was seventy-one or seventy-two years old at the time of the deed, was somewhat worn down [868] from his wife's last illness and death, feared that he might not recover from the operation and was suffering some pain and inconvenience from his prostate trouble. But it appears from the undisputed medical testimony that the prostate trouble did not become acute until a few days after the deed had been executed, when a stoppage occurred for the first time, and plaintiff's physical condition was not such as to prevent him from understanding the nature of the transaction. Furthermore, shortly before the deed was executed he drove his car to Joliet, Illinois, and back to Kansas City to bring back his daughter's family, and then drove out to Topeka, Kansas, and back. He made two visits on his own initiative, and unaccompanied by any of the defendants, to his attorney, with whom he was well acquainted, and on the second visit executed the deed and acknowledged it before his attorney, who was a notary. He drove his car down to the attorney's office on these occations.

Nearly six years later at the age of seventy-seven, plaintiff testified that he had no recollection whatsoever of executing the deed, and as to a lack of recollection of anything that occurred during the conversation with his son except the alleged fraudulent misrepresentations, but his memory of everything else connected with the transaction and with the subsequent handling of the property on the basis of having deeded it to his children appeared to be good. The deed was dated September 28, 1935, but was not recorded until about eight months later. Plaintiff's son and daughter both testified that plaintiff remarked to the effect that if they did not take the trouble to record the deed he might ask them to deed it back to him again, and that then they recorded the deed. Plaintiff denies any recollection of any such conversation or knowledge that the deed was recorded until just before suit was filed, but the record shows without question that he considered that he had passed title to his children.

The property in question represented all the real estate that plaintiff and his wife had acquired (except a farm in Texas), but plaintiff

had about $8,000.00 in bonds out of the family savings, and also a deed of trust to property that was subsequently foreclosed and produced a small income. Plaintiff's daughter and her family lived with plaintiff for about two years. Her husband had been unable to obtain any but occasional employment since coming to Kansas City, but did a good deal of work in repairs and improvements on the property, including some materials from the windup of his Illinois business. The daughter collected the rents and turned very little over to her father, but provided him with food, clothes and a home, and he was apparently satisfied with the situation and made no complaint. Finally the daughter's husband, in June, 1937, had a business opportunity in Texas whereby he could make enough money to afford a college education to his children and the family moved away, plaintiff preferring to remain instead of going with his daughter. She arranged to have plaintiff's son and his family move in for the summer, but thereafter plaintiff's son, who was the principal of a junior high school in Topeka, had to return there, and plaintiff preferred to live alone, rejecting the daughter's attempted arrangements for a housekeeper, but receiving frequent week-end visits from his son and less frequent visits from his daughter, with both of whom he remained on good terms at least until just before the suit was filed.

After the daughter moved away the son took charge of the property for about two years, turning $50.00 a month over to plaintiff and spending the remainder on taxes and upkeep. About the end of 1939 plaintiff asked to take charge of the property, and his son acquiesced therein. Plaintiff did not keep the property in complete repair and paid nothing to either defendant. He purchased a new automobile and was seen so frequently in the company of women (including a woman employed at the hospital where he had had his operation) that his children feared he might remarry.

According to the version of defendants, it was not until shortly before suit was filed, about five years after the deed was executed, that plaintiff asked to have the property deeded back to him, stating that he might want to remarry. According to plaintiff's testimony he began to regret the transaction almost at once, because he thought there would be less friction in the family if he had deeded part of the property to his son and part to his daughter, instead of to them jointly. He claims that his son threatened to evict him from his residence. This was denied.

The deed is an unqualified warranty deed containing no mention as to the $50.00 per month agreement or the right to use the [869] residence. While plaintiff was in the hospital his son discussed a possible written contract with plaintiff's attorney, but took no further action until some friction over the handling of the property resulted in the son several years later having a tentative form of contract prepared by his own attorney, which contained additional provisions not satisfactory to plaintiff.

Appellants contend that a mistrial should have been declared because of bias on the part of the trial judge resulting in the case being prejudged in favor of plaintiff. Only two witnesses were called on plaintiff's behalf—himself and the attorney who drew the deed. It was while plaintiff was testifying on redirect examination that the first of the matters complained of as indicating bias on the part of the court occurred. The incident was this: Plaintiff was asked, "Do you get along with your son's wife?" He replied, "The son's wife is a wonderful woman. She is better than he is." His attorney then inquired as to whether she was present, and on receiving an affirmative reply, the attorney observed, "She seems to be very interested." Whereupon, the court said, "She seems to want me to understand about this evidence. She is nodding and shaking her head and I didn't know whether she was friendly to the old gentleman or not. *She evidently was trying to influence me.*"

This was followed by the court's interruption of defendant's first witness, plaintiff's daughter, Mrs. Grohne, whose testimony had indicated that she was at least a reasonably dutiful daughter. After his questioning had developed that she had left her father and joined her husband in Texas, who had accepted a position that would enable them to properly educate their children, which had not been possible on his limited earnings while the family was living with her father in Kansas City, the court propounded such questions as these:

"Q. Why don't you give your father the deed back?

"Q. You don't feel any obligation to aid and comfort him when he is 77 years old. You are willing to come in and contest this case in court.

"Q. You don't want to show him any consideration.

"Q. All right. Go ahead. He is not my father. He is yours.

"Q. Did you ever pay him back for your schooling?

"Q. And then run out on them when they get 75?

"Q. You really think that you and your children own an interest in your father's property?"

At the conclusion of this examination, Mr. Fane, counsel for defendants said, "If Your Honor please, we would like to have a conference with you in chambers with reference to the balance of our case." To which the court replied: "My advice to you would be to give the old gentleman's property back to him or get on good terms with him and treat him as a father. If he wants to get married, that is his business. . . . You don't own your father's property. A lot of people this day and age think they do." It was at this time that defendants requested that a mistrial be declared because "the court has already determined the issues in this case, and has in the presence of the witness and in the presence of all the parties and witnesses on both sides suggested that the defendants ought to give

back the property, which, of course, is the relief the plaintiff now seeks."

Throughout the subsequent presentation of defendants' case the court, on several occasions, propounded questions or made remarks which were at least susceptible to the construction placed on them by counsel at the time as indicating bias, but we deem it unnecessary to determine whether the trial judge should have declared a mistrial when requested by counsel for defendants. This is an appeal in a proceeding in equity and the trial is *de novo* in this court. [Niehaus v. Madden, 348 Mo. 770, 155 S. W. (2d) 141.] We are not bound by the findings of the trial judge. [Hoxsey Hotel Company v. Farm & Home Savings & Loan Assn., 349 Mo. 880, 163 S. W. (2d) 766.] Ordinarily this court will attach substantial weight to the findings of the chancellor, especially where conflicting oral testimony is involved. [Niehaus v. Madden, supra.] However, in view of the unusual situation here presented, we are disposed to weigh the evidence ourselves without regard to the findings of the chancellor.

In doing so, the question arises as to the relative weight to be given to the testimony of plaintiff and his children, there being sharp conflict on matters as to which [870] there was no opportunity for corroboration by disinterested witnesses. While there are a few inconsistencies in the testimony of the children, and their testimony should be received with great caution, on the whole they present a plausible and consistent story, corroborated by other witnesses whenever it was reasonably possible or practical to obtain corroboration. On other points, such as the matriarchal family rule during the lifetime of their mother, and her demands during her last illness, and plaintiff's acquiescence, plaintiff made no attempt at rebuttal. On the other hand plaintiff was testifying at the age of seventy-seven concerning matters which had occurred nearly six years before. On some of the most vital matters he testified that he had no recollection. He denied any recollection of the deed that he executed and acknowledged at his attorney's office. He even denied discussing the deed with his attorney, although it appeared from the testimony of his attorney, offered as a witness for plaintiff, that he had undoubtedly done so. Yet he claimed to remember that he had not asked his attorney about the inheritance taxes. He denied all recollection of the conversation at Topeka with his son, except the alleged representations as to the inheritance taxes. Yet he remembered many matters occurring at about that time. We do not feel justified in accepting the uncorroborated testimony of plaintiff where it is in conflict with the positive testimony of his children.

We do not think that there is here involved a deed by an aged person in consideration of an agreement for care and support during the balance of his life, as was the situation in many of the cases cited by respondent. We think the transaction should be construed as a gift

in which the grantor intended to retain or reserve certain rights as to the property which was transferred. Plaintiff's petition indicates that, rather than being furnished a home with his children, he was to have "the right to occupy a house on the premises, rent free, as long as he lived" and instead of support in general, he was to receive "the sum of $50.00 per month *out of the rentals of the property* for his support as long as he lived." The answer of defendants uses similar language. Plaintiff's children recognized at least a moral obligation to provide plaintiff with a home if he desired to leave Kansas City—which he did not—and there is some evidence which would support a finding that there was such a premise as a consideration for the deed. But this is contrary to the issues framed by the pleadings on both sides, and such evidence is not conclusive enough for us to ignore the pleadings.

Plaintiff claims that the inducing cause of the execution of the deed was alleged fraudulent representations of his son to the effect that inheritance taxes would be so heavy that the property would be lost if they inherited it. Assuming, but without deciding, that this would constitute an actionable fraudulent representation, if made, we are of the opinion that it was not established by the record. The only evidence of such alleged fraud is plaintiff's unsupported testimony of such statements alleged to have been made to him when he discussed the matter with his son in Topeka shortly before the deed was executed. It was flatly denied by the son. While plaintiff testified as to this alleged statement, he disclaimed any recollection of anything else, stating that he was too ill to remember the conversation. (But not too ill to drive his car from Kansas City to Topeka and back.)

We think the most reasonable conclusion from the record is that the real inducing cause of the execution of the deed was the dying request of plaintiff's wife, to which he had acquiesced. He made no attempt to refute the testimony of his children on this matter. Apparently he regarded the matter of saving inheritance taxes as a factor, but if the question of such taxes being ruinous had occasioned the deed, it is strange that he would not have mentioned the matter to his attorney during one of the two consultations that he had before he executed the deed. Especially since it appears from the undisputed evidence that it was not his practice either before or after to rely upon the advice of his son. The claim of fraud is against the weight of the evidence.

There is no basis for the claim that the deed is invalid because of plaintiff's mental condition at the time it was executed. The overwhelming weight of the evidence is to the effect that he was capable of understanding the nature of the transaction. It appears even from plaintiff's only corroborating witness, his attorney, that plaintiff explained the transaction and what he wanted done. The attorney would

[871] hardly have taken his acknowledgment if plaintiff had shown any indication of being in a mentally irresponsible condition at the time. And even if the deed were originally invalid for this reason, he ratified, affirmed, and adopted it by his subsequent course of conduct for a number of years after his return from the hospital, including his suggestion to his children that they record it.

Should the deed be canceled because no agreement was executed as to plaintiff's reserved rights in the property? There was at least some sort of an understanding that the reserved rights of plaintiff should be incorporated in a written agreement. After plaintiff's son had discussed such an agreement with plaintiff's attorney, the matter was dropped for undisclosed reasons. Yet plaintiff did not consider the evidencing of his reserved rights in the form of an executed instrument as a vital matter. About eight months after the deed was executed, he suggested that it be recorded, though the matter of the written agreement had been dropped. It was not brought up again until friction developed some years later, and plaintiff's son had an agreement drawn up with qualifications that savored too much a spendthrift trust to suit plaintiff. Yet plaintiff's reserved rights have always been recognized by defendants. During the first two years plaintiff did not receive much cash, but there was an alternative family living arrangement in which plaintiff acquiesced, and was apparently satisfactory to him. Thereafter, plaintiff not only resided in the family residence, rent free, but received $50.00 per month out of the rents. And for a considerable period prior to suit, and thereafter, he received the entire rentals, retaining more than $50.00 per month and making insufficient repairs. We do not accept plaintiff's claim that his son threatened to evict him, as it is denied by the son, and is contrary to the whole course of the son's prior conduct and to the position taken in his pleadings.

We find that defendants have substantially complied with their agreement as to the reserved rights of plaintiff, though they have not been incorporated in a written instrument.

Where an aged person attacks a transaction such as is here involved, the court should be satisfied that he has not been overreached and that his rights have been fully respected, and will grant appropriate relief without being much concerned with legal theory or technicalities. [See Finley v. Williams, 325 Mo. 688, 29 S. W. (2d) 103.] While we think the deed should not be set aside in view of the substantial performance of defendants, it would not be equitable to deny plaintiff any relief. We think it proper that plaintiff's reserved rights be formally recognized. This should have been done long before. Whether or not the son had proper motives in trying to impose a quasi-guardianship upon the expenditures of his father, it affords no justification in equity for not recognizing plaintiff's reserved rights by an instrument without added qualifications. The

deed should be reformed so as to include a reservation of the right to occupy a house on the premises—the family residence if plaintiff prefers—rent free, as long as he shall live. This means the right to the *exclusive* occupancy of the house if plaintiff so desires. (The record indicates that one of the defendants had a different interpretation of the matter.) And the reservation should also include the right of plaintiff to receive the sum of $50.00 per month out of the gross rentals of the property for his support as long as he shall live. The costs, both in the trial court and on appeal, should be charged one-half against plaintiff, and one-half against defendants William P. Deitz and Florence Grohne.

The decree of the trial court is reversed and the cause is remanded with directions to enter a decree in accord with this opinion. All concur.