Mary C. KENNER, Appellant,

v.

Emma E. AUBUCHON and Arthur J. Wibracht, Respondents.

No. 44309.

Supreme Court of Missouri.

Division No. 1.

July 11, 1955.

McClintock & Medley, Flat River, for appellant.

Melvin Englehart, Fredericktown, Dearing & Richeson, Will B. Dearing, Hillsboro, for respondent.

DALTON, Presiding Judge.

Action in equity to cancel two deeds conveying described real estate in Elvins, St. Francois County, for want of consideration and on the ground of fraud and misrepresentation in obtaining plaintiff's signature. Plaintiff further seeks to recover damages for loss of rents and for expenses result-ing from the alleged fraud. The cause went on change of venue to the Circuit Court of Washington County where it was tried in October 1953. For convenience we shall continue to refer to the parties as plaintiff and defendant and, by defendant, we refer to Emma E. Aubuchon, since no issue is presented as to the other defendant.

The trial court found that plaintiff, a 91 year old woman, intentionally executed the deeds as a gift to defendant, her sole surviving daughter, to avoid the necessity for a will and probate proceedings after death, but that "the plaintiff did not intend to release her rights to the use of her property and the rents therefrom during her lifetime." The court refused to cancel the deeds, but reformed and corrected them so as to reserve to the plaintiff the right to occupy the residence on one tract during her lifetime and the court directed defendant to rent the other tract, collect the rents and pay all necessary repairs and taxes and to monthly pay the net balance of rents and profits to plaintiff during her lifetime. An annual accounting to the court was ordered and the costs of the suit were divided between the parties. Plaintiff has appealed and contends that the decree is for the wrong party and against the weight of the evidence; and that it attempts to afford relief not requested by the plaintiff and not within the issues made by the pleadings.

The deeds in question were warranty deeds, dated November 28, 1951. They recite a consideration of "one dollar, love and affection" and purportedly were acknowledged on the date indicated before Arthur J. Wibracht, a notary public, in the city of St. Louis. They were not filed for record until September 9, 1952. Plaintiff alleged that defendant fraudulently represented to her that the deeds were papers in connection with a teacher's pension of her deceased daughter. The application for these benefits was signed at Fredericktown, Missouri, on October 25, 1951. The correspondence with the Executive Secretary and the Chief Accountant of the Public School Retirement System, pending the

payment of the claim, was carried on by defendant. A check in the sum of $374.78 in payment of the claim was dated November 30, 1951, and was payable to plaintiff. The deeds and application for benefits purport to bear plaintiff's signature and the check purports to bear her endorsement. Defendant's evidence shows that plaintiff signed the application (which was offered in evidence) and that she endorsed the check, but defendant said she cashed the check and divided the proceeds with plaintiff. Plaintiff, on the other hand, testified that she never saw or heard of the check and didn't get any part of the $374.-78. She further expressly denied that she had signed the deeds, or the application for benefits, or that she had endorsed the check.

Plaintiff was 93 years of age at the time of the trial and resided in Elvins, where the real estate is located. For many years plaintiff resided with her daughter Lucy, a school teacher, who died October 12, 1951. Defendant, a widow some seventy years of age, apparently had lived in the same vicinity where plaintiff resided but, in December 1950, defendant went to Fredericktown to operate the Madison Hotel. Lucy was then desperately ill and, about May 20, 1951, plaintiff and Lucy came to live with defendant. After Lucy's death, plaintiff advised defendant that she had executed a will in favor of Lucy and, in view of Lucy's death, the will was destroyed. As stated, the deeds are dated November 28, 1951. On May 30, 1952, plaintiff left defendant's hotel and returned to her home in Elvins, where she was apparently assisted by Alvin Rehkop, her great grandson.

Plaintiff testified that she was blind in one eye and that her sight was not very good in the other. Defendant also testified that plaintiff could neither see nor hear and should not be living alone. Plaintiff's testimony tends to show that she first learned that defendant was claiming the properties in question when the tenants of the property refused to pay the rent to her and told her that defendant had deeds to the property. This was after her return to Elvins in May 1952. Plaintiff fixed the

time as about a year after Lucy's death, or during the following summer. Alvin Rehkop, plaintiff's great grandson, learned of the deeds in June 1952, when a tenant refused to pay rent to the plaintiff. Rehkop later examined the land records at Farmington with plaintiff in July or August 1952, but the deeds to defendant had not been recorded. As stated, the deeds were filed for record on September 9, 1952, and, two days later, on September 11, 1952, defendant instituted, in the Probate Court of St. Francois County, an insanity proceeding against the plaintiff. Plaintiff resisted and employed counsel to defend, and defendant, thereafter, on September 29, 1952, withdrew the charges and dismissed the proceedings on the alleged ground of avoiding the cost of such a proceeding.

Plaintiff testified that she never knowingly signed any deeds to the properties; that she never discussed giving or selling the properties to defendant; and that she never at any time intended to convey the properties to defendant. As stated, when the two deeds, the application for benefits and the endorsement on the check were presented to plaintiff for identification of signatures, she denied each signature and repeatedly stated that she "never signed no deed." When a signature purporting to be her signature on her deposition was presented to her she said: "I am too near blind to tell you whether I signed or not * * * I guess I signed it." Plaintiff admitted that she went to St. Louis on November 28, 1951 with defendant and defendant's son, Kenner Aubuchon and his wife, and that she went to the home of her grandson (Kenner Aubuchon), but she denied that she signed any deeds on the trip.

Mrs. Mary Belle Finnical, a daughter of defendant and granddaughter of plaintiff, testified that in the latter part of January 1952, in defendant's living room in the hotel at Fredericktown, defendant told her that she had everything fixed so nobody would bother the property, as she had it all in her name; and that plaintiff thought she was signing an application for Aunt Lucy's teacher's pension when she signed the deeds over to her. The witness said she

didn't believe the story until after the insanity proceedings were instituted. When the several purported signatures of plaintiff were exhibited to the witness, she said she could not say "either way" as to the signatures on the deeds, but said that the endorsement on the check and the signature to the deposition looked like plaintiff's signature.

Mrs. Thelma Aubuchon, age 45, another daughter of defendant and granddaughter of plaintiff, testified that, in November 1952 in witness's home in St. Louis, the defendant told her that she had deeds to plaintiff's property; that she had obtained the deeds by having plaintiff sign, when plaintiff thought she was signing Aunt Lucy's school pension; and that plaintiff didn't know what she was signing when she signed the deeds. Witness said she was not particularly impressed by the statement until she learned that defendant was collecting the rents and keeping them. The witness could not identify her grandmother's signature on either of the deeds, the application for benefits, the deposition, or the check.

Defendant, in her own behalf, testified about as follows: She had always taken care of her mother during the last ten years. She didn't think plaintiff had "cooked a bite in the last ten or fifteen years." She (defendant) had done the cooking at home for fifteen years. She had been taking care of plaintiff's property for ten years. She "always took care of the rent for mother." She had always collected the rent; that her mother depended upon her for that. She "had been collecting the rent and keeping up the repairs on the property for ten years." She not only collected the rent and gave receipts to the renters, but she "rented the property and got the leases and everything." She gave the money from the rents to her mother and sister. On May 20, 1951, her mother and sister came to live with her at Fredericktown and after Lucy's death plaintiff "burned up" her will and on different occasions discussed with defendant the disposition of her property. At plaintiff's request defendant wrote up an agreement

saying plaintiff would sign deeds to defendant. Plaintiff signed the agreement, but later it was torn up. Plaintiff wanted deeds prepared to convey the property to defendant and defendant took the old deeds over to attorney Jerry Schnapp's office. He prepared the new deeds (as was confirmed by Schnapp's testimony). On November 28, 1951, Schnapp did not have time to come to the hotel to take plaintiff's acknowledgment and plaintiff could not go up the steps to Schnapp's office, so the "blank deeds" were obtained from him. Defendant's son Kenner Aubuchon, his wife and children, arrived on November 27, 1951, to take plaintiff and defendant to St. Louis on the 28th. Plaintiff wanted to go to Elvins, but, agreed that the deeds could be taken to St. Louis and signed there. Kenner drove by his place of employment and the office manager, a Notary Public, came out to the automobile, examined the deeds and stood by the automobile while the deeds were signed by plaintiff. Plaintiff signed the deeds on the back of the front seat, while plaintiff and defendant were in the back seat together. Defendant handed her pen to plaintiff and held the deeds on the back of the front seat while plaintiff signed them. The deeds were then taken into the company's office for the Notary Public to sign and affix his seal. Kenner remained to work and plaintiff and defendant and Kenner's wife went on to Kenner's home. That evening Kenner brought the duly acknowledged deeds to his home and handed them to plaintiff and plaintiff gave them to defendant. Defendant also testified that "when they were notarized, my son gave them to me." "He handed them to me and I showed them to her and she said they were all right." The parties returned to Fredericktown the next day and defendant put the deeds in her locker. Defendant denied that she had directed her mother to make the deeds. She said her mother wanted the deeds made to her to keep it out of Probate Court, as defendant was "the only living heir"; that she had not paid her mother anything for the property; and that there was no intention to make the deeds to defendant and reserve a life

estate in plaintiff as plaintiff did not want them that way.

Defendant's son Kenner and his wife confirmed defendant's testimony concerning the actual signing and acknowledgment of the two deeds. The Notary Public had no record and no independent recollection of the occasion. He identified his signature on the two deeds and said he would not have placed his name and seal on the instruments, unless the person signing them signed before him.

Defendant testified that she did not trick her mother or misrepresent anything at the time the deeds were signed and delivered. She denied the statements attributed to her by her two daughters and said the pension application had been signed almost a month before the deeds were made. She did not record the deeds until about the time of the insanity proceeding, when she was advised to record them.

On April 10, 1952, long after she had the deeds, defendant wrote to her grandson Alvin Rehkop, who was looking after plaintiff, and said that plaintiff had an idea of raising the rents, but that it would not do "at this time so better not take her down town." Defendant said she recorded the deeds so she could collect the rents to pay for repairs, because, after plaintiff returned to Elvins in May 1952, plaintiff and Alvin Rehkop collected the rents for several months and there was no money for repairs. The trial judge refused to permit plaintiff's counsel to cross-examine defendant as to why she put the deeds in her locker instead of promptly recording them. No offer of proof was made. Defendant admitted that she "didn't make any outward claim" to the property until the deeds were recorded, but she had told several persons "the deeds were made." Defendant insisted that the insanity proceedings were instituted to protect her mother and for her mother's good. Many reasons were assigned, including that plaintiff "didn't keep herself clean. I had always done that." Plaintiff "was collecting the rents at that time." Defendant went to Elvins on two or three different occasions to deed the property back to plaintiff, but could not talk to plaintiff about any thing.

Until July 1952, defendant took the house rent to her mother every month and put it in her hand. Defendant also paid all expenses including the insurance on the property. Plaintiff and Lucy had had a joint account where the rent money was deposited, but after Lucy died defendant took over the joint account with plaintiff. Defendant further testified that after the deeds were executed, plaintiff wanted the rents from the property and received them and, after May 1952, plaintiff collected the rent two or three times, until defendant stopped the renters from paying rent to plaintiff. Defendant presented an account book in court with a notation: "Mother collected rent from May 1951, for eleven months." Defendant also testified that she herself collected the rents and gave them to her mother. The account book, beginning May 20, 1951, showed that defendant had collected $980 in rents and had paid out $822.05 on behalf of her mother and the property; and that she had $157.95 on hand in July of 1952. Defendant kept the rents for herself beginning in August 1952.

Defendant further testified that she and the plaintiff had the joint account for rents in the Bonne Terre Bank, until plaintiff (and Alvin Rehkop) drew out $90 that defendant was saving for repairs. Defendant then changed the account to her own (July 20, 1952). Since that time defendant had been collecting the rents and paying the bills and she "could not say whose money it was."

Plaintiff in rebuttal denied she was receiving any part of the rents from defendant, however, she admitted collecting $10 per month from one piece of property. Several witnesses testified that defendant's general reputation for truth and veracity was bad, but later other witnesses testified that it was good.

The court found that plaintiff was a reasonably active woman, considering her age;

that her hearing, sight and memory were somewhat impaired, but probably average for her age; that the deeds were executed and delivered by plaintiff to defendant, as a gift, while plaintiff was residing in defendant's home and while she was being "cared for by the defendant"; that, at the time plaintiff executed the deeds, "she was intending to do away with the necessity for a will and court proceedings after her death", but that she did not "intend to release her rights to the use of her property and the rents therefrom during her lifetime." The court further found that "it was also the intention of the defendant that plaintiff should have the use of the property during her lifetime." The court based these latter findings primarily upon the conduct of the parties after the execution and delivery of the deeds, including plaintiff's failure to act promptly after receiving knowledge of the deeds, her subsequent attempts to collect the rents from the commercial property and the method the defendant adopted "in carrying a joint bank account with the plaintiff for the deposit of the rent money." The court found that plaintiff's failure to recall having executed the deeds, like her failure to recall her action in "collecting money from the deceased daughter's pension account", was "nothing uncommon for a person of plaintiff's age." As stated, the deeds were reformed and corrected to conform to what the court found was the real intent of the parties.

In entering its decree the trial court was apparently endeavoring to follow the case of Deitz v. Deitz, 351 Mo. 306, 172 S.W.2d 866, 871. In that case the plaintiff had sought and obtained a decree setting aside a deed for fraud in its procurement. This court reversed the judgment as against the weight of the evidence, but ordered that plaintiff's reserved rights, which had always been recognized by defendants, should be formally recognized in a decree.

In reviewing this case on appeal, we must look to the issues raised by the pleadings. The deeds were attacked upon only two grounds and no accounting for rents and profits was requested, although plaintiff did ask $2,000 damages for expenses, inconvenience and loss of rent on account of the fraud. The grounds assigned for cancellation of the deeds were fraud and want of consideration. The specific allegations upon which the cause was tried were that plaintiff was the owner of the described real estate and "that on or about the 28th day of November 1951, defendant Emma E. Aubuchon wrongfully and fraudulently obtained plaintiff's signature on two deeds conveying said real estate to defendant; that plaintiff did not know she was signing deeds for the reason that said defendant concealed that fact from plaintiff and wrongfully and fraudulently represented to plaintiff that the papers she was signing were in connection with a teacher's pension of her deceased daughter * * * that she did not at any time intend to execute deeds of the aforesaid property to defendant Emma E. Aubuchon * * * that she received no consideration for said deeds and had no knowledge of their existence until the tenants of said real estate refused to pay rent to plaintiff * * * that she did not at any time appear before a Notary Public and acknowledge her signature but that defendant Arthur J. Wibracht wrongfully and falsely certified that plaintiff had appeared before him * * *."

Plaintiff offered no testimony concerning the actual execution of the deeds, instead she specifically denied that the signatures on the deeds were her signatures and she further denied that the signatures appearing on the application for the retirement benefits and on the back of the check were hers. Plaintiff is, of course, bound by her own personal testimony. Since she denied that she signed either deed and testified that the signatures appearing thereon were not hers, the alleged declarations of defendant against interest, as testified to by defendant's two daughters, cannot aid the plaintiff's case. The fraud alleged by plaintiff was not proven, nor supported by her own testimony and, since there was no proof of the actual commission of the fraud charged, the evidence concerning the al-

leged declarations of defendant against interest (what defendant may have said to her two daughters) is insufficient to support the charge of fraud. In effect plaintiff now contends that, although she testified that she did not sign the deeds and that the signatures thereon were not hers, yet the court should find that she did in fact sign them and that she signed them because of defendant's fraudulent misrepresentation that the deeds were in fact papers connected with or were applications for benefits due plaintiff as a result of her daughter Lucy's membership in the School Retirement System. We cannot so find upon this record. Plaintiff's own testimony disproves her allegation that she signed the deeds by reason of the fraud and misrepresentation of defendant, and there is no evidence that the alleged fraudulent representations were in fact made to plaintiff.

On the other hand, the testimony of defendant, as to the voluntary execution of the deeds by plaintiff to defendant, is supported by the testimony of her son, her daughter-in-law and the Notary Public as well as by the several signatures on the exhibits, one of which showed plaintiff's admitted signature. The trial judge saw and heard the several witnesses for defendant and apparently believed their testimony. Not only did he see the several signatures denied by plaintiff, but he saw the signature on plaintiff's deposition, which signature has not been brought up on appeal. The pleadings on which the cause was tried contained no charge that the deeds were forged, or that they were obtained by undue influence, or that they were executed because of defendant's activity while defendant was occupying a position of trust and confidence with plaintiff. A cause must be reviewed on appeal on the theory upon which it was brought and tried. Since it appears that the deeds were voluntary conveyances, as gifts, by a mother to her daughter, it is wholly immaterial that plaintiff received no money compensation for the deeds. The recital of one dollar, love and affection was sufficient. Schneider v. Johnson, 357 Mo. 245,

207 S.W.2d 461, 467; Binnion v. Clark, 359 Mo. 202, 221 S.W.2d 214, 217.

In support of her contention that the decree is against the weight of the evidence, plaintiff, as appellant, cites Gist v. Pylant, Mo.Sup., 25 S.W.2d 479; Basman v. Frank, Mo.Sup., 250 S.W.2d 989; White v. Whitaker, Mo.Sup., 171 S.W.2d 684; Liddell v. Lee, Mo.Sup., 159 S.W.2d 769. The evidence in each of these cases was materially different from the evidence presented here. Further, the evidence in each case supported the allegations of the petition and, in each case cited, the trial court believed and accepted the plaintiff's evidence and granted the relief sought and in each case this court on appeal affirmed the cancellations which the trial court had decreed. In this case, however, the trial court believed the defendant's evidence and denied the relief sought.

Plaintiff urges us "to weigh the evidence without regard for the findings of the trial judge for the reason that the trial judge exhibited throughout the trial of the case bias and prejudice in favor of defendant and against the plaintiff." Deitz v. Deitz, supra, is relied upon, but the facts are not similar. During the course of the trial the plaintiff filed an application for change of venue from the judge on account of alleged bias and prejudice. The application was denied. A careful review of the record in this case fails to disclose that any bias or prejudice was exhibited by the trial judge against the plaintiff or in favor of defendant. It is true that counsel was frequently limited, but not unduly, in his very extended cross-examination of defendant and of her witnesses concerning matters which might affect their credibility and the weight and value to be given to their testimony, but the extent of such cross-examination rested within the sound discretion of the trial court. The record fails to disclose that such cross-examination was unduly curtailed, except in a single instance where the trial judge refused to permit counsel to cross-examine the defendant concerning her reasons for withholding the deeds from record from November 28, 1951 to September 9, 1952.

Plaintiff further complains that the decree of the court is erroneous in ordering the deeds reformed and corrected. She says the decree attempts to afford relief not requested by plaintiff and not within the issues presented to the court by the pleadings. The rule relied upon is stated in Branner v. Klaber, 330 Mo. 306, 49 S.W.2d 169, 180, as follows: "The powers of a court of equity are broad, but they are limited to the cause of action and issues made by the pleadings. The power to give relief in addition to that prayed for means relief consistent with the suit tried." And see Kemp v. Woods, 363 Mo. 427, 251 S.W.2d 684 and Friedel v. Bailey, 329 Mo. 22, 44 S.W.2d 9, 15.

In this case defendant has not appealed, although the part of the decree of which plaintiff complains grants relief to plaintiff which is adverse to defendant. If defendant had appealed we would have a different question. While plaintiff has appealed and complains of that part of the decree, which grants her some relief by reforming and correcting the deeds, we do not find the decree prejudicial to plaintiff, because under the findings as to her theory of the case she was entitled to no relief. Therefore the decree deprives her of nothing to which she is entitled under the record presented. The decree is consistent with findings of fact made by the court and defendant admits that all findings are supported by the evidence. On plaintiff's own theory of the case defendant was entitled to a judgment dismissing plaintiff's petition.

Plaintiff further insists that this court should "require defendant to account fully to plaintiff for all monies collected as rental from the property in question", but plaintiff asked no such relief in the trial court and no suit for an accounting was tried below. Plaintiff says that she sought relief "on the theory that the deeds were void", and that the court granted her relief on the theory that the deeds were valid and ordered the deeds reformed to conform to the intention of both parties. As stated, the error, if any, was not adverse or prejudicial to plaintiff. Plaintiff further complains that the decree divests her of her right to control the life estate granted to her, because the defendant is made "a trustee of plaintiff's life estate", the decree providing that defendant should rent the property, collect the rents and profits, pay taxes, insurance and repairs and then pay the balance to plaintiff. We think it is clear from this record that plaintiff is unable to look after the property in question and that she is entitled to no relief on her theory of the case. The court refused to cancel the deeds, but did grant some relief and this could be done where, as here, the defendant approves the decree and seeks to support it. In granting such relief the court could impose such terms and burdens upon the relief granted as appears reasonable and proper. Since all the relief sought by plaintiff was properly denied, she may not complain on appeal of matters not prejudicial to her rights.

The judgment is affirmed.

All concur.